## CORNELIUS D. FREELS v. STATE.

No. A-3537—Opinion Filed March 12, 1921.

(195 Pac. 1094.)

(Syllabus.)

1. **HOMICIDE—Manslaughter in First Degree—Sufficiency of Evidence.** The evidence examined, and found abundantly sufficient to support the verdict.

2. **WITNESSES—Impeachment—Inconsistent Statements.** It is improper and may be prejudicial to lay the foundation to impeach and to impeach a witness on cross-examination on purely collateral and immaterial matters; but, where facts explanatory of threats made in a homicide case are brought out on the examination in chief of one of defendant's own witnesses, then such facts become material, and the witness reciting them may be impeached by showing that at other times and places he made contradictory or inconsistent statements of the incidents connected with such threats.

3. **HOMICIDE—Dying Declaration—Admissibility.** Where the deceased, a short time after he was shot and a few minutes before

he expired, knowing that death was impending, referring to the defendant, who was at that moment passing in the custody of the arresting officer, said, "He threatened to kill me," such statement, under the circumstances in this case, was properly admitted as a dying declaration.

*Appeal from District Court, Muskogee County;*

*Charles G. Watts, Judge.*

Cornelius D. Freels was convicted of manslaughter in the first degree, and he appeals. Affirmed.

*Crump & De Graffenried,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *E. L. Fulton,* Asst. Atty. Gen., for the state.

BESSEY, J. On the 19th day of October, 1918, Cornelius D. Freels, plaintiff in error, hereinafter referred to as the defendant, was informed against in the district court of Muskogee county for the murder of Jacob William Shoults in the city of Muskogee on the 24th day of September, 1918. Upon trial a verdict was rendered against the defendant for manslaughter in the first degree on November 23, 1918, and the court, upon rendering judgment, fixed the punishment at imprisonment in the state penitentiary for a period of 20 years. From this judgment the defendant has appealed to this court.

Testimony on the part of the state shows that for some time prior to the homicide deceased had been living at the Rockefeller Hotel in Muskogee; that on this day two peace officers were sitting on the front porch of this hotel, watching a car which was said to have been stolen and which was at a garage diagonally across the street from the hotel; that while these officers were sitting there deceased came out of the hotel and stepped off the

porch onto the sidewalk adjoining, placing one hand on one of the pillars of the porch, near where the officers sat, and engaged in conversation with them; that while he was in this position the defendant approached, and, without words or warning, fired two shots from a 45 Colt's revolver, one of which entered the back of the deceased at about the tenth rib and about four inches to the right of the spinal column, passing through the body and coming out at the left of the umbilicus, resulting in death about one hour later. These peace officers did not see the defendant before the first shot was fired, and heard no words and saw no demonstration on the part of the deceased indicating that he knew of the presence of the defendant. After the first shot was fired one of the officers grappled with the defendant and overpowered him, and while this was going on another shot was fired. The deceased had no weapon in his hand and none was found on his person after the tragedy.

The defendant testified that he had had previous trouble with the deceased, and that the latter had threatened his life, both in his presence and in the presence of others, who had communicated these threats to him; that upon this occasion he came to where the deceased stood and discovered him unexpectedly; that the deceased saw him and turned and reached for something in his pocket; that the defendant believed that the deceased was about to shoot him; and that defendant fired the fatal shot in his necessary self-defense.

The several assignments of error which plaintiff in error urges in his brief may be grouped and treated as follows:

(1)   That the verdict of the jury was contrary to the law and the evidence.

(2)   That the court erred in permitting the witness Hughes, over the objections of the defendant, to answer an impeaching question as to what had been stated to him by another witness  touching collateral matters not in issue in this case.

Error of the court in permitting the witness Hamilton to testify to certain alleged dying declarations of the deceased.

First.  Without setting out and analyzing the testimony in detail, we think the evidence was amply sufficient to support the verdict.  Indeed, under the evidence, as we view it, the jury would have been justified in bringing in a verdict for murder instead of for manslaughter in the first degree, and since the jury took the view more favorable to the defendant, he has no cause for complaint.

Second.  It is next insisted that the court erred in permitting the witness Hughes, over the objections of the defendant, to answer an impeaching question on a matter collateral to the issue.  A Mr. Howlett, a witness for the defendant, in his examination in chief testified that he was and for a long time prior to the homicide had been the owner and manager of a rooming house in Muskogee, in which the deceased was for a time employed, and that the defendant at the same time was lodging at this house; that about nine months previous to the homicide the defendant and the deceased had a quarrel in the washroom of the rooming house.  The witness was asked in the course of his examination by defendant's attorney:

"Q. Now tell what was said by each one, as near as you can remember it. A. Shoults said, 'What did you have Gruno arrested for?' and Freels said, 'I had him arrested for talking about the President of the United States, blowing up smokestacks and one thing and another; that is what I had him arrested for, talking about this country,' and Shoults said, 'Well, I will tell you, he says that you had no business having him arrested.' He says, 'You had no business to have Gruno arrested.' He said that Wilson ran on the ticket, on a peace ticket, and he said he was a damn traitor to his country, and he said that before this war was over the Kaiser was going to whip the world, and Freels said, 'I won't—,' and I stepped out and said, 'You cut this out; don't you say another word about this; I am not going to have any trouble about it.' I said, 'Freels, you step inside, and John, you step inside,' and he said, 'I will blow the damn son of a bitch's brains out if he is talking about Germany.' And I said, 'Shoults, you go on in there; you will have to cut this out.' So John went in his room right there, and he said, 'I am going to kill that damn son of a bitch, if it is the last thing I do.' He said, 'I told Freels—' "

In the cross-examination of this witness by County Attorney Cotton for the purpose of impeachment questions were asked and answers given as follows:

"Q. Mr. Howlett, in that conversation that you had with Mr. Hughes there, didn't he ask you as to what statements, disloyal statements, you ever heard the deceased make, and if you didn't say to him then that the only statement or things that you knew was disloyal against the deceased was at the time that he would not testify against Otto Gruno, who was charged with being a pro-German, and if that wasn't—and didn't state to him that that was all that you ever heard or knew about, or words to that effect? A. I don't remember that statement at all; I can tell you the conversation I had.

"Q. You say you don't remember? A. No, sir."

Afterwards the county attorney called the witness

B. G. Hughes to testify  for the state and asked him the
following question:                               ,

"Q.   Mr. Hughes, didn't the witness Sterling How-
lett, at the Elgin rooming house on the afternoon of
the day the shooting took place state to you this, or this
in substance:  First, didn't you ask him this question,
didn't you ask Mr. Sterling Howlett this question in sub-
stance: Did you not tell Mr. Hughes that you knew of
no reason for Shoults being a pro-German except that he
refused to testify against Otto Gruno? or words to that
effect, and didn't he—Mr. Hughes, in that conversation
you had with him there, didn't you ask Mr. Howlett as
to what statements, disloyal statements, he ever heard
the deceased make, and if he didn't say to you there that
the only statements or things that he knew against the
deceased was at the time he would not testify in the
case of Otto Gruno, who was charged with being a pro-
German, and didn't he state to you that was all he ever
heard. or words to that effect?

"Mr. Crump (for defendant) : Objected to as incom-
petent, irrelevant, and immaterial, and for the further
reason that it is not the same question asked Howlett,
and for the further reason that the question is practically
unintelligible, and for the further reason that it is an
attempt to impeach a witness on an immaterial matter.

"The Court:   Objection overruled.

"Mr. Crump:   Defendant excepts.

,     "The Witness:   That was the substance."

The defendant attacks the admissibility of this testi-
mony on the ground that it is an attempt to impeach his
witness on a collateral and immaterial point, that the
question as to whether the deceased was pro-German is
immaterial, and that the jury may have concluded that,

if this witness testified falsely concerning immaterial facts, his testimony relating to facts that were material was not worthy of credit.

The rule of impeachment on collateral matters has been laid down by this court in, *Payne v. State*, 10 Okla. Cr. 314, 136 Pac. 201, and in *Willis v. State*, 13 Okla. Cr. 700, 167 Pac. 333, where it is stated as follows:

"When a witness is cross-examined on a matter collateral to the issue, his answer is conclusive and cannot be subsequently contradicted by way of impeachment by the party putting the question. The test of whether a fact inquired of in cross-examination is collateral is this: Would the cross-examining party be entitled to prove it as a part of his case tending to establish his plea?

But was this collateral and immaterial testimony? In both of the cases noted above the foundation for the impeachment of the witness on collateral and immaterial matters was laid on cross-examination, while in this case the damaging, disloyal statements of which complaint is made, if indeed they were damaging, were brought out in the examination in chief of the defendant's own witness, as explanatory of why the deceased had threatened to kill the defendant, as claimed by defendant. These disloyal statements were material as tending to show why the threat against the defendant was made, if indeed it was made. The state, under such circumstances, would have a right to impeach the witness by showing that at other times and places he had made contradictory or inconsistent statements. *Smith v. State*, 3 Okla. Cr. 629, 108 Pac. 418; Greenleaf on Evidence (16th Ed.) vol. 1, §§ 461f, 462a; 40 Cyc. 2572.

Where. as in this case, a witness attempts to recite

the incidents of a quarrel previous to and leading up to the homicide, if these statements are admissible at all, the jury is entitled to know all that occurred and all that was said at the time; and, since some. of the statements so made contained threats by the deceased against the defendant indicating a hostile attitude between the parties, it was proper for the jury to have the entire statement, although inseparable portions of such statement were not material. This argument or quarrel took place nine months before the homicide occurred, and the credibility of this witness and the weight to be given to his testimony were matters for the jury. Greenleaf on Evidence, *supra*, § 462b.

Third. The testimony shows that the deceased expired about one hour after he was shot; that before his removal to the hospital he was conscious and knew that he had been shot through the body at a vital spot, and. that immediately after the shooting he had exclaimed, "I am killed! I am killed!" While waiting for the ambulance one Flora Armstrong asked the deceased, in the presence of. Cass Hamilton, who shot him, and he replied by spelling defendant's name, "F-r-e-e-l-s."

Witness Hamilton was asked this question:

"Q. Did he make any statement there with reference to anything that had been done or said to him by this defendant? A. Yes, sir.

"Q. Tell the jury what he said. A. He asked for a drink of water, and Dr. Hollingsworth said, 'Don't give him much water.' And I raised him up with my right hand, and he took a little bit of water, and the gentleman who did the killing passed in the patrol wagon, and he looked out the window and he says—says kind of like

that—in a mumbling tone, 'He threatened to kill me.' "

So far as we can ascertain from the record, the deceased was speaking of the incidents that had just taken place, and this testimony was properly admitted as a dying declaration. For the sake of argument only, assuming that this evidence might be inadmissible and giving the defendant's testimony the benefit of the most favorable construction, the jury would not have been justified in bringing in a verdict of acquittal on the theory of self-defense. If the expression, "He threatened to kill me," referred to some other time not connected with the res gestae, it might have been prejudicial had the verdict been for murder; but, since the verdict was for manslaughter only, the question of prejudicial error in this regard is eliminated.

Finding no prejudicial error in this record, the judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.