## COLLINS TILLERY v. STATE.

No. A-3821.   Opinion Filed April 21, 1923.

(214 Pac. 198.)

(Syllabus.)

1. **Trial—Placing Part of Jury in One Room and Part in Another with Different Bailiffs not Failure to Keep Jury Together.** Where, after the law and the evidence were finally submitted to the jury, and the jury placed in charge of two bailiffs, who were admonished to keep the jury together, the bailiffs took the jury to a hotel for the purpose of procuring lodging for the night, and seven of the jurors were placed in one room in charge of one of the bailiffs, and five in another room in charge of the other bailiff, this constitutes no substantial deviation from the court's order.

2. **Appeal and Error—Conviction not Set Aside Where Some Substantial Evidence to Support Verdict.** When the sufficiency of the evidence is challenged, and the evidence as a whole does not satisfactorily or conclusively convince the appellate court of the guilt of the accused, the verdict will not be set aside on the ground of insufficiency of the evidence where, as in this case, there is some substantial evidence tending to support the verdict. The weight of the testimony and the credibility of the witnesses is for the jury.

Appeal from District Court, Oklahoma County; Edward D. Oldfield, Judge.

Collins Tillery was convicted of murder and he appeals. Affirmed.

C. E. Corbett, H. C. Hawkins, W. H. Twine, G. W. Carry, and E. T. Barbour, for plaintiff in error.

The Attorney General and E. L. Fulton, Asst. Atty. Gen., for the State.

BESSEY, J.   Collins Tillery, plaintiff in error, here designated the defendant, was by information filed in the district court of Oklahoma county on December 10, 1919, charged with the murder of J. M. Williams. At the trial, by a verdict of a jury on January 23, 1920, defendant was found guilty of murder, and his punishment fixed at hard labor for life in

the state penitentiary. From the judgment on this verdict he appeals.

The assignments of error may be condensed into two:

First. That after final submission of the law and the evidence to the jury the jurors separated, contrary to the admonition of the court.

Second. That the evidence is insufficient to sustain the verdict.

The record shows that after the case was finally submitted to the jury and the bailiffs admonished to keep the jury together they took lodging in the Lawrence Hotel, where seven of the jurors were placed in one room in charge of one of the bailiffs, and the other five in another room in charge of the other bailiff. This was no substantial deviation from the court's order, and afforded no opportunity to corrupt or influence the jury. This procedure was therefore without prejudice to the accused.

The assignment of error seriously urged by the defendant is that the evidence is insufficient to support the verdict rendered. The positive and circumstantial evidence is complex, consisting of a great number of facts, circumstances, and incidents, and making it impracticable to recite a concise, lucid analysis of all the facts and circumstances shown in evidence.

The defendant was a negro, a plasterer by trade. It is practically undisputed that he had two homes, one with a mistress in servants' quarters in the northwestern part of the city, and the other with his mother in the negro section of the city, about three blocks from where the homicide took place. The killing occurred on an east-bound Fourth Street car in Oklahoma City, at about 11 o'clock in the morning of September 30, 1919, and the murdered man was the conductor

in charge of the street car. There was evidence showing that during the forenoon of that day the defendant had been at five different places in various parts of the eastern portion of town. At 8 o'clock, or a little later, he was at a blacksmith shop where he made a plasterer's dauber. At about 9 or 9:30 he was at Union Headquarters, at 329 East First street, where he kept some of his working clothes and tools. Defendant claims that immediately after that he went to his home at 916 East Second street, and that from there he went about two blocks, where he talked to some workmen who were repairing a house. In this he was corroborated by one of the workmen, who claimed to have talked with him there at a little before 11 o'clock, as nearly as he could recall the time. At a few minutes before 12 he was at Ninth and Laird streets, where he helped a man put a cap on a chimney. This time was definitely fixed by the workman there, as well as by the owner of the house, who fixed the time positively by the blowing of the noon whistle.

The testimony on the part of the state tended strongly to show that defendant was on a Fourth Street car going west, and that he had a quarrel with the deceased conductor at the intersection of Fourth street and Harrison avenue at 9:58 o'clock over the matter of a transfer, and that he immediately thereafter boarded a Fair Grounds car going east. This time was definitely fixed by the car schedules and street railway records. About 11 o'clock, or shortly thereafter, he was again on a Fourth Street car going east, and that at Fourth and Phillips streets he, or some other negro (being variously described by different witnesses), shot and killed the conductor in charge of the car. This time was also definitely fixed by the motorman of the car as being between 11:13 and 11:18.

The defendant was positively shown to have been at work at Ninth and Laird, where he had gone to work as a plasterer by previous agreement with the owner of the property, at a few minutes before 12 as above stated. If the person seen at these various places was the defendant, his clothing had been changed in part, or else the witnesses were mistaken about his appearance and the clothing he wore. The negro who had the difficulty with the conductor at Fourth and Harrison was described by two witnesses as being coatless and wearing a cap. Three witnesses agreed that the man who did the shooting was wearing a dark suit, including a coat, and a dark hat. It may have been possible, though it would seem improbable, for the defendant after the difficulty at Fourth and Harrison, to have gone east on a Fair Grounds car at 10 o'clock, go to his home and change clothes, and then go back and be a passenger again on the east-bound Fourth Street car at 11 o'clock, or a few minutes after, getting on the car several blocks west of the corner where the conductor was assaulted and killed.

The defendant denied being at Fourth and Harrison streets that morning, as well as denying the murder. If the defendant was the negro who had the difficulty with the conductor at Fourth and Harrison—and we think the evidence so shows, there being testimony so identifying him by persons who had previously known him and were personally acquainted with him—and if it was also he who did the shooting at Fourth and Phillips a few minutes after 11, it was necessary for the defendant, within one hour and a few minutes over, to have ridden out to the vicinity of Ninth and Laird, where he was preparing to plaster a house, from there walk to his home on East Second, change clothes, return to Fourth street, several blocks from his home, and somewhere on Fourth street before the car reached Phillips board this eastbound Fourth

street car on which the conductor was killed as he (the defendant) got off the car at Fourth and Phillips. This deduction is necessary because the man who did the killing was not dressed like the man who had the quarrel with the conductor at Fourth and Harrison, and because defendant was shown to have been at Ninth and Laird before he returned to go to work there at about noon. If it was the same person, by tracing his movements as shown by a plat of the city in evidence, it appears that he must have made a change of clothing, walked 12 to 15 blocks, and ridden 18 or 20 blocks, all within a period of a few minutes over one hour next before the shooting.

A shoe salesman testified that the negro who had the difficulty with the conductor at 10 o'clock at Fourth and Harrison wore a dark-colored cap, salt and pepper trousers, khaki shirt, and wore no coat. A shoe repair man, whose shop was within 50 or 60 feet from where the difficulty took place, described the negro's clothing practically the same as did the salesman. The motorman on the car testified that the negro who had the difficulty with the conductor at this corner was dressed differently from the one who did the shooting at Fourth and Phillips. Two other witnesses identified the defendant as the man who had the trouble at Fourth and Harrison without describing his clothing.

The appearance of the negro who did the shooting at Fourth and Phillips and the clothing worn by him were differently described by different witnesses. One witness stated that the man who did the shooting wore no coat, and that he wore a light shirt. The motorman testified that the negro who did the killing had on blue coat and trousers and a brown hat; that he was positive of that, as he stood and looked him over from head to foot for about a minute after the shooting. Another witness said he wore a hat and a dark suit, and

still another said that the man who did the shooting wore a dark coat and vest, dark trousers, and a brown hat, but was not certain about the color of his shirt. From the testimony it is apparent that, if the man who did the shooting was the same man who had the difficulty with the conductor at Fourth and Harrison, he had in the meantime changed his clothes. The motorman so testified and others corroborated him. To our mind the testimony is sufficient to identify the defendant as being the negro who had the trouble with the conductor at Fourth and Harrison, but it is not so clear that he was the negro who did the killing at Fourth and Phillips.

The testimony is positive that, if the negro who did the killing was the defendant, within 30 minutes from the time he was last seen after the killing he was at Ninth and Laird streets, in working clothes, and at work, and that from the place where he was last seen after the killing to Ninth and Laird is a distance of nine blocks. The psychology of the situation would indicate that one who had committed a homicide would not ordinarily calmly and deliberately go to work in the vicinity of the commission of the homicide immediately thereafter, and more particularly would this be true where the accused is a negro. We are inclined to think it would be characteristic of the negro, under such circumstances, to seek safety in flight.

After the homicide many suspected negroes were brought into the police station for investigation and identification. The defendant was not arrested until eight days after the homicide. When he was arrested he was taken by the officers to his home in the negro section. His mother was absent and the door locked. By means of a key taken from the defendant's person the door was unlocked and entrance made and the house searched. The officers asked the defendant if he had a gun. He said that he had, but had not used it for some time

and had given it to his mother; that they might find it in the trunk or in the dresser. The defendant produced another key and unlocked the trunk. Nothing was found in the trunk nor in the dresser, but in a suit case the officers found a quantity of 32-caliber cartridges. Later a 32-caliber Colt's pistol was found in the inside vest pocket of a vest hanging on the wall in the kitchen, with a magazine full of cartridges. An empty cartridge or shell, corresponding to the cartridges found in the pistol and suit case, was found in the vestibule of the car where the conductor was killed.

The defendant took the stand and described his movements from place to place during the forenoon of the day of the tragedy. He made no incriminating admissions on the witness stand or to the officers during the investigation. He denied that he was at Fourth and Harrison streets that morning, and denied any participation in or any knowledge of the homicide.

This recital of the facts is, we think, a fair resume of the outstanding incidents surrounding this tragedy, as disclosed by the record. In computing distances and tracing the movements of the accused, as shown by his own evidence and that of the state, the court has carefully inspected the map or plat of the places, streets, and blocks mentioned in the testimony. There was evidence indicating that the defendant, as well as many other negroes, for some days after the tragedy were afraid that they would be suspected of this homicide, and rode from place to place in the negro section and other parts of the city in taxicabs to avoid using the street cars. There was also evidence that the accused, when he was in a jocular manner accused of being the negro who committed this homicide, protested that his accusers should quit talking that way; that the statements made might be taken seriously and cause him trouble.

It appears further that none of the witnesses brought into the police station for the purpose of identifying the defendant after his arrest would positively identify him as the man who did the shooting.

All of the evidence has been most carefully scrutinized, and the question now presents itself to the court whether or not the testimony as a whole is sufficient to support the verdict.

If the writer of this opinion had been a member of the jury in the trial court, the verdict would probably have been otherwise, but, reviewing the evidence as a court, we cannot say that there was no substantial evidence pointing to the guilt of the accused. If this murder was deliberately planned by the accused, he could have committed the act and still have been at the different places, as shown by the evidence, at the times shown. These rapid changes in clothing and his presence at so many different places may have been purposely arranged to establish an alibi. The motives and the deductions drawn from these and other facts were questions for the jury. There may be some question as to whether the right negro was convicted. This man may be a victim of circumstances. This is a case where the accused may properly move for executive clemency to such an extent as this record and subsequent disclosures may justify.

Since there is no such absence of evidence of defendant's guilt as would warrant this court in setting aside the verdict, the judgment of the trial court must be and is affirmed.

MATSON, P. J., and DOYLE, J., concur.