## ALYSE WAGONER v. STATE.

No. A-9041.  Sept. 18, 1936.
(61 Pac. [2d] 33.)

B. C. Franklin, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error was by information charged with larceny; was tried, convicted, and sentenced to serve a term of six months in the state penitentiary, at McAlester. Motion for new trial was filed, considered, overruled, and the plaintiff in error appeals. The parties will hereafter in this opinion be referred to as they appear in the trial court.

Allen Thompson, testifying for the state, stated:

"I live at 2488 North Madison; on the night of March 25, 1935, I went to the Lafayette hotel about 12 o'clock; when I arrived at the hotel I saw Alyse and Charley Wagoner; we began drinking and Alyse suggested she get a girl for me; we continued to drink after the girl arrived; I went in the bath room and removed my shoe and sock and placed $57 in bills in the toe of my sock, then put my sock and shoe back on and went back and joined the party; Charley Wagoner gave me a glass with a butter dish on it when I went back; I saw Charley with a small bottle and inquired what he was doing with it, and Wagoner advised me it was toothache medicine; I got dizzy and did not pay any attention to what was going on.

"Alyse Wagoner had secured a room for me and the girl who afterwards proved to be Ophelia Lawrence, but Alyse told me her name was Marie; the girl Alyse brought to her apartment came in to the room where I was and sit down on the bed and I immediately went to sleep; I was awakened, Alyse Wagoner opened the door, came in and pulled off my shoe and sock and immediately went out; the next morning when I awoke my money was gone, and I told Charley Wagoner I had been robbed and told him it was a frame up; Charley and Alyse joined me to go out and find the strange girl whom they said was named Marie; we did not find the girl and Charley and Alyse dodged me; I never got my money back."

The state called J. N. Tyler, a deputy sheriff, who testified in substance as follows:

"I recollect the occasion of Allen Thompson claiming he lost his money; I went with Allen to see Alyse Wagoner at the Hotel; Alyse and Thompson had some heated words and it developed that Alyse and Charley Wagoner had referred to the strange woman as Marie; we went across the street to see Ophelia Lawrence at the Royal hotel; Ophelia told me Alyse brought her 10 dollars that morning after Thompson claims to have been robbed; Alyse and Ophelia went back in the hotel room and I stayed on the outside. I could not hear any of the conversation but I finally notified them I was going to arrest the whole bunch; Ophelia told me she had been begging Alyse to return the money to Thompson; Alyse denied having the money. I arrested them all and put them in jail; Ophelia finally gave me 10 dollars to keep until the trial was over, then it was to be returned to Allen Thompson."

Ophelia Lawrence, testifying for the state, stated:

"I live at 605 East Archer; I know Alyse Wagoner; on the 25th day of March, 1935, Alyse Wagoner came over to my hotel to ask me to go over to her house for a drink; when we got there there were two men there beside her husband; shortly after we got there one of the men left; Alyse said to Allen Thompson she wanted him to meet a girl friend of hers; Alyse and her husband kept telling Allen Thompson I was a nice girl, and Thompson said, can we go some place, and I said, I don't know; I did not go to bed; I went in the room we had rented; Alyse went down and got the room; after we went in the room Allen pulled off his clothes and I sat there on the bed; he took off everything but his underwear; he kept his socks on.

"After we had been in there a few minutes the door opened; when Alyse came in it kindly scared me; she said not to say anything; I sat there and did not move; she went to the bed, grabbed his socks and I did not say anything; she pulled the sock off and immediately left the room; when she left the room I left it and went over

to my room, and found I had left my key at Alyse's room. I saw Alyse the next morning in my room; she came there before I had gotten up and said, I am getting kind of scared, this guy is just raising sand about his money, don't you say anything; here is $10; I told her I did not want to be in it, and she replied, 'say nothing;' I told him a girl named Marie took the money and that Marie lived over at the Small hotel. I kept the $10 and gave it to Mr. Tyler when he came, and told Mr. Tyler what had happened."

Mr. J. N. Tyler, testifying for the state, stated:

"I have been in the sheriff's office for about five years; I know Alyse Wagoner; I know Ophelia Lawrence; I know when Thompson lost his money; when I heard Thompson had lost his money I went up to Alyse Wagoner's rooms and talked to her about it, and later went to see Ophelia Lawrence. When I went to see Alyse Wagoner, Allen Thompson was with me and began talking to Alyse and they had some words, and she told him she did not know anything about it; said she did not get the money; said a girl named Marie got it and she did not know where she lived, and she said she did not give a damn if she had taken his life. I took Alyse in her room and Charley her husband was in bed; I told them I wanted to get this boy's money; Alyse still denied she got the money but said she would try to find Marie, that she roomed at the Small hotel. I told them I did not believe there was a Marie in the deal. Alyse stated there was and that Marie came to her room shortly after Allen Thompson came.

"I went across the street to see Ophelia where she roomed at the Royal hotel; she said Marie roomed at the Small; Ophelia denied any knowledge of it at first, but later she said she had 10 dollars Alyse brought over to her the next morning after Thompson claimed he lost it. I took Ophelia to get the porter Fulson, and while we were talking out in front of the hotel Alyse came up. Fulson was telling Ophelia about going back for the key, and Alyse spoke up and said, you know that is not so,

this is not the girl, the girl was named Marie. Fulson said, no, I know this girl, she goes there all the time to see you; Alyse says you are sure mistaken, this is not the girl we rented the room for from you. We then went up stairs, I sent Alyse and Ophelia in the room and told them to get the money or I was going to arrest all of them; they stayed so long I went up and stood outside the door for a few minutes and then knocked on the door; I told them I was going to arrest all of them if they did not get the money; Ophelia said I am just telling her now, Mr. Tyler, to give him the money back. I finally took all of them to jail. Ophelia gave me $10 that she claimed Alyse gave her."

Mrs. Thomas C. Wilson, called in behalf of the defendant, stated she had lived in Tulsa for four years; the defendant had worked for her almost two years of that time; the reputation of the defendant during the time she worked for her was good.

Walter Fulson, testifying on behalf of the defendant, stated:

"I live at 533 East Jasper; I am a porter at the Lafayette hotel; I was there on the night of March 25, 1935; I saw Mrs. Wagoner and Ophelia, I do not remember seeing the gentleman there (referring to Mr. Thompson); Ophelia rented a room from me that night and paid me for the room; the room was No. 304; Ophelia left the hotel about 4:30, to the best of my knowledge; I judge it was about three when they went into the room; I was sitting in the lobby when Ophelia came down stairs, and started across the street and looked back; after that one of the porters from her hotel came over to the hotel and knocked on Mrs. Wagoner's room and asked for a key."

The defendant, testifying in he own behalf, stated: She was living at the Lafayette Hotel on the 25th day of March, 1935; had lived in Tulsa a little more than four

years; had been engaged in private homes, and checking cabs.

"Ophelia Lawrence was in the Lafayette, in my room on the night of March 25, 1935; Allen Thompson was also there; Thompson was about drunk when he came to the room; he had known my husband for several years; he tried to get Charley to go for Ophelia but he would not; Charley said, 'if Alyse wants to she can go'; I woke Ophelia and said 'Allen is in the house and wants to see you'; she said, 'how long has he been there?' and I said he had just come in; as we went back we met Baby Howard, and we went to Berry's Garage, as Howard claimed he wanted to do some telephoning; the boys were sitting in the bed room talking to Charley when we came up and I asked if Ophelia came up, and he said, 'yes, she is in the living room talking with Allen.' I went to the living room and asked Ophelia what she was doing with the lights off, and she said she was not doing anything, just hugging him. I went down and told the porter Allen wanted a room, and when the porter came up Allen told Ophelia to go ahead and pay him and he would give her the money back when he got to the room; Ophelia paid the porter 50 cents. I next saw Allen about seven o'clock the next morning. I did not go in his room or pull his socks off and take any money out of them, nor did I take any money from his person. When he came to our room the next morning he said the girl had taken the money off of him; I laughed because I did not think he had any money."

Thompson claimed he knew Ophelia. "I got up and went over to the hotel to see Ophelia and she was asleep; I said, 'Ophelia, Allen said you took some money off of him last night,' and she said, 'Allen is lying'; she said she did not go to bed; she said he would not do what I wanted him to do and I did not get his money; I did not give Ophelia 10 dollars she stated I gave her. Mr. Tyler brought Ophelia up to the house; he brought her back again about a quarter to 12 that night and took all of us to the county jail. I never told Thompson that the

woman I brought up was Marie; he knew Ophelia when she came up there."

Charley Wagoner, testifying for the defendant, stated:

He was the husband of Alyse Wagoner.

"I know Allen Thompson, have known him for more than 20 years; he visited me often since he met me here; he was in my room on the 25th of March, 1935. I know Ophelia Lawrence; they had been there on more than one occasion; on the night of March 25th, 1935, about 11:30 or 12, Allen Thompson, Wallace Alexander and Omar Mitchell came up to our rooms, and Thompson wanted to know if we had anything to drink; we took a drink and he kept on asking why I was not drinking; Thompson asked me to go and find Ophelia for him; I finally told Alyse to see if she could find her and bring her and a ginger ale back with her; when Ophelia came in Thompson went in to the front room and lay down on the studio couch and had gone to sleep; she gave me the ginger ale and goes in to where Thompson was and she turned the light out. When Alyse came in she asked Ophelia what she was doing in there with the lights out, and Ophelia said nothing, just hugging porter. We tried to wake Thompson but could not; Mitchell finally woke him. After fooling around a little after they woke him up Thompson taken a high ball and gets Alyse to rent a room, and she goes down and it was not long until Fulson came up, and Ophelia gave Fulson 50 cents for the room; Ophelia and Thompson stayed in our apartments a little while and I never saw them any more that night. About seven o'clock the next morning Thompson came to the room and said, 'Where does that girl Ophelia live?' And Alyse says, 'she stays right across the street at one of those hotels.' Thompson said she had taken something like $77 off of me last night, and asked Alyse to go with him and find her, as she was liable to spend the money. We went to the street with Thompson and I had to go on to town; we left him and it was not long before Thompson came

back again; that night about 8 o'clock Tyler and Thompson was at the door, and Alyse and this girl; they came in and Tyler told Alyse he wanted to talk to me privately. These two girls and Tyler told me that Ophelia had taken some money off of Thompson and that he was trying to recover the money.

"Tyler left shortly afterwards to talk to Ophelia. I went down on the street, and Mr. Tyler was riding around the block and was going back and forth up in the Royal Hotel there with Ophelia. Ophelia came in and wanted to talk with Alyse privately; I eavesdropped the conversation and Ophelia tells Alyse to let her have some money, that 'Tyler is going to arrest me if I do not let him have some money.' About that time Tyler came in and said he was going to take Ophelia to jail, and send her to the penitentiary. One word brought on another and Tyler gets hot and says, 'I am going to take all three of you down to jail.' I did not tell Thompson the woman he had up there with him was named Marie."

Several other witnesses testify as to seeing the defendant and the woman named Ophelia around at different places, and also as to the prosecuting witness Allen Thompson's actions with Ophelia, keeping late hours and night parties, and going back and forth from the room of the defendant and her husband to Ophelia's and other places.

The foregoing is the substance of the testimony material to the issue joined in this case.

The defendant in her petition in error has assigned four errors alleged to have been committed by the trial court, the third assignment being that the court erred in overruling plaintiff in error's motion for a new trial. The motion for a new trial states one ground for a new trial, and that is:

"There is a total lack of evidence to support the verdict of the jury; that it is evident that the jury was prejudiced against the defendant on the ground of her alleged husband, Charley Wagoner."

The defendant, in her argument in support of the assignment that there is no evidence to sustain the verdict of the jury, states that the jury was prejudiced against her on account of her husband, Charley Wagoner. There is no evidence in the record tending to support this contention. When the record is reviewed, we find this deplorable condition: We find a man and his wife living in a hotel apartment having drunk men in the apartment at late hours at night, the wife leaving the apartment and going across the street and securing a woman for the prosecuting witness in this case, Allen Thompson. It is admitted by all the witnesses that all parties mentioned were in the apartment of Charley and Alyse Wagoner. The only dispute in the testimony is the defendant denies she got Allen Thompson's money. The testimony is in direct conflict upon that one question, and that one only: Did Alyse Wagoner get Allen Thompson's money and the next morning turn over $10 to Ophelia Lawrence and ask her to say nothing, and tell Thompson the girl she got for him the night previous was named Marie? The defendant and her husband contradict Thompson and say that he knew Ophelia Lawrence, and knew there was no girl by the name of Marie with him that night.

All of the witnesses admit Allen Thompson was in the apartment of the defendant and her husband after midnight; that he was drunk and went to sleep on the studio couch; and that when Ophelia Lawrence came up she went into the room where Thompson was and turned out the light, and when the defendant came into the apartment she asked Ophelia why she had the light turned

off, and Ophelia replied she was hugging him; later the defendant goes downstairs and gets a room for Thompson and Ophelia; Ophelia pays 50 cents for the room, and Thompson undressed and got on the bed and went to sleep. Ophelia says she did not go to bed, but says that after she had been there a short while the defendant in this case opened the door and came in and went to the foot of the bed and took Allen Thompson's socks off and immediately hurried out of the room. Thompson says his money was in his sock. The testimony, though conflicting, shows by direct and positive testimony that the defendant went to the room where Ophelia and Allen Thompson were and pulled Thompson's socks off and rushed from the room, and Ophelia says the next morning the defendant came over and gave her $10 and requested her to say nothing.

The only question to be considered by this court is: Is there sufficient evidence to sustain the verdict of the jury? This court has many times passed on this question, and in the case of Tillery v. State, 23 Okla. Cr. 226, 214 Pac. 198, it said that a conviction "will not be set aside * * * where * * * there is some substantial evidence * * * to support the verdict."

The jury is the exclusive judge of the weight of the evidence, and if there is a clear conflict in the evidence, or it is such that different inferences can be drawn from it, this determination will not be interfered with unless it is clearly against the weight of the evidence or appears to have been influenced by passion or prejudice. Choate v. State, 37 Okla. Cr. 314, 258 Pac. 360; Pickett v. State, 35 Okla. Cr. 60, 248 Pac. 352; Evans v. State, 55 Okla. Cr. 157, 26 Pac. (2d) 767.

In this case there is no indication that passion or prejudice entered into the consideration of the jury in arriving at its verdict.

In Adams v. State, 54 Okla. Cr. 363, 21 Pac. (2d) 1075, in the first syllabus the court said:

"Conflicting issues of fact are for the sole determination of the jury. A conviction will not be disturbed on appeal because of conflicts in the evidence, if the evidence adduced reasonably tends to support the verdict and judgment."

The jury after hearing the evidence, the instructions of the court, and argument by counsel, by its verdict found against the defendant, and this court is not inclined to disturb the finding of the jury. We hold there is sufficient testimony though conflicting to sustain the judgment.

The case is affirmed.

DOYLE, J., concurring. EDWARDS, P. J., absent, not participating.