# NORMAN ORME v. STATE.

No. A-9275.   Jan. 14, 1938.

(75 P. 2d 482.)

A. J. Morris and Kenneth Mitchell, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and F. M. Dudley, Asst. Atty. Gen., for the State.

DAVENPORT, P. J.   The defendant was jointly charged with Ed Spencer, by information in the district court of Caddo county, Okla., with the crime of murder, was tried separately, convicted of manslaughter in the first degree, and sentenced to be confined in the state

penitentiary for a period of 25 years, and has appealed.

The testimony on behalf of the state shows that the defendant and the deceased resided in the city of Anadarko, and had known each other for a number of years. Wayne Butterfield was engaged and working at a filling station at Fifth and Main, in Anadarko, Okla. The defendant and Ed Spencer left the defendant's home, the defendant taking a pistol with him, and after driving for some time went to a hardware store and Ed Spencer bought for the defendant some shells for his pistol and took them out to the defendant, and defendant loaded the pistol; they then drove on around to where the defendant believed he would find the deceased, Wayne Butterfield; Ed Spencer was still in the car with the defendant.

When they reached the filling station the testimony shows the defendant asked Merle Butterfield, who was a brother of Wayne Butterfield, the deceased, where Wayne was, and Merle advised the deceased Wayne was in the filling station, and the defendant stated to Merle that he was going to kill Wayne Butterfield. About this time Wayne came out of the filling station and Merle said for him to go back, or words to that effect. The defendant repeated what he had said to Merle, that he was going to kill Wayne, using some vile epithet, and the deceased, Wayne Butterfield, continued to come on toward the defendant and stated in substance, "Why, Tangle (that was the nick name of the defendant) you wouldn't kill anyone." The defendant got out of his car and as the deceased approached near it he fired a shot, and the deceased fell mortally wounded.

The proof further shows the defendant went around his car and fired again, and then kindo' stepped over the

feet of the deceased and fired toward the ground. The witnesses say it looked to them like he fired at the head of the deceased as he was lying on the ground. The proof shows the defendant then got in his car and drove away, leaving Ed Spencer at the scene of the difficulty.

L. H. Cannon in substance corroborated the witness Merle Butterfield as to what took place before the shots were fired, stating:

"I was connected in a business way with the Butterfields and was present at the time of the shooting on the 22d day of March, 1936. I heard the defendant ask Merle where Wayne was, and he said, 'Tell Wayne I am going to kill him.' Merle was standing near the front end of the gasoline tank when this conversation took place, and replied to the defendant, 'You are not going to kill anybody.' The next thing I noticed Wayne was coming out of the station door, and Wayne said, 'Why, Tangle, you aint going to kill anyone.' At that time the defendant was stepping out of his car, on the west side; he picked up the pistol and told Wayne he was going to kill him; Wayne was walking on toward the defendant slowly; when Wayne got within six to ten feet of the defendant the defendant shot him."

Coy Lyon, a witness for the state, testified in substance the same as did Merle Butterfield and L. H. Cannon.

Other witnesses testified to hearing the shooting and stepping out in the street and seeing the defendant at the filling station, and seeing him drive away.

The testimony conclusively shows that on the day of the tragedy the defendant, in company with Ed Spencer, drove to the filling station; the defendant making his presence known and telling Merle Butterfield, a brother of the deceased, to tell his brother Wayne he was going to kill him, and when Wayne Butterfield came out of the

office door and started to come to where the defendant was, the defendant repeated his statement, he was going to kill him, and Wayne replied, calling him by his nickname, "Why, Tangle, you are not going to kill anyone."

The defendant got back in his car immediately after the shooting and drove away. Later, he was found at his home and taken into custody by the officers, and the pistol he had used in shooting the deceased was delivered to one of the officers by the defendant's wife.

There is no testimony of the state showing the deceased and defendant had any difficulty prior to the date of the killing, except a statement permitted to be introduced by the trial court by the father of the deceased who claimed that the deceased just prior to his death, in talking about the case to him, in substance, stated that the only difficulty he had with the defendant was about an account, and the defendant tried to shoot him, and he took the pistol away from defendant and gave it to his wife. The testimony was permitted to go to the jury over the objections of the defendant.

There is no testimony in the record showing any ill feeling or anticipated trouble between the deceased and the defendant prior to the day of the killing.

The foregoing is the substance of the testimony in chief on behalf of the state.

The defendant, testifying in his own behalf, stated:

"I have known Wayne Butterfield ever since he was a child; the deceased and I associated together until the day of his death. I have never had any trouble with the deceased prior to the day of this trouble. Ed Spencer was working for me on the day of the tragedy. I first saw Wayne Butterfield at Ada Hooks', I was down there hunting Sam Searcy, a colored boy, who had been working

for me. I went into the kitchen door at Ada Hooks' place; I don't know whether Ed Spencer went into the house or not. Thelma Moran was also in there, she is married and I think her name is Hayes now; they were playing the piano when I went in; I was there just a little while; as I started out Wayne followed me into the kitchen and stopped me as I started out; he jumped me up, he was drinking at the time and said to me, 'I want that gas bill'; I said, 'Wayne, I have no money,' and he replied, 'You have'; and I told him, 'I do not owe you a gas bill, I owe your brother,' and he said, 'You would not pay it, you damned son of a bitch, if you had all kinds of money'; I said, 'Let's not have any trouble in the lady's house,' and he said, 'I have a God damn good notion to cut your throat'. He had a knife in his hand and started to grab me and a colored boy named Jack pulled him back, and he said, 'All right we will just go and get the receipt.' We went out to the car and Ed Spencer came out; Wayne was cussing me and said, 'I will open up your throat so you can talk.' He had his knife in his hand; we got him quieted down and got in the car, Ed Spencer, Wayne and myself, and started for my house to show him the receipt; I did not have a gun with me at Ada Hooks' place. Wayne at no time ever took a gun away from me and gave it to my wife. We drove away in the car and I let Ed Spencer out of the car on Main street; I do not know how long I remained at Henry Huitt's I would judge about three-quarters of an hour. When I went home my wife was wrapping her leg up to her knee, her shin was bruised and her sock was all torn down one leg, a chair was turned over in the house and I asked her what was going on. She did not want to tell me, she was crying. She told me what had happened and I said, 'I will go up and see Merle Butterfield. The business we are in I am afraid to say a whole lot about it; I will go up and see Merle and see if I cannot get him to straighten up.' My wife said not to do that, 'Wayne said he would kill you if I ever told you'; I said, 'I am going to talk to him anyway', and my wife said, 'If you do take your gun.' She gave me the gun and I went by the hardware store and Ed Spencer

went in and got some shells. Ed came out and brought the shells to me. I gave him the money to buy the shells, and I put them in the gun. Ed got in the car with me and I went on straight east to the next corner from the hardware store, and then up toward the post office, and went to my brother Mutt's filling station. From there I started home; when I passed the Skelly filling station I did not see anyone; when I got about even with the filling station Merle was out to the truck.

"I drove up and honked my horn and Merle came out to my car; the door on the left side of the car was all taped up and I could not lower the glass; Merle came to the car, placed his foot on the running board and talked to me with his head partly in the door at the side of the car; I told Merle I wanted him to keep Wayne away from my house, and Merle said, 'What in the hell has he done now?'; about that time Wayne came out of the filling station and I told Merle to tell him to go back; Merle said, 'Wayne get back'; Wayne kept coming and I grabbed my gun, which was down in the seat, and cocked it; Merle said, 'Wayne, get back, he has a gun,' and Wayne said, 'I don't give a God damn if the son of a bitch has got a gun, I will do all the talking there is to do.' Wayne kept coming in from the back of the car and I stepped out and shot him; I never saw his hands, when he came out of the filling station he was pulling at his sweater; Wayne was in five or six feet of me when I shot; I was scared I was going to get killed; I believed he had a knife or a gun; I would not have shot him had I not thought I was in danger; I did not tell Merle when I drove up there I was going to kill Wayne; I did not expect to see him at that time; Merle did not tell me Wayne was in the filling station; I asked Merle to keep Wayne away from my house. At the time of the difficulty my throat was so bad I could scarcely talk above a whisper. I did not say anything about whether I was going to kill him or not, I did not have time.

"I know about Wayne having a difficulty in Oklahoma City at the bus station, south of the Kingkade Hotel; Wayne got into an argument with a cab driver,

and got out his knife, and another driver took the knife away from him. He was drunk at that time. I saw him have a difficulty with Joe Davis, near Barney Hammert's place; Wayne pulled a gun on Joe and Carl Rosston and I took it away from him.

"I got out of my car after Wayne came out of the filling station; I grabbed my gun and got out of the car and Ed Spencer grabbed hold of my arm, and I said, 'Look out, he will kill us both,' and Spencer turned me loose; I stepped one foot out on the running board and the other on the pavement and shot him. After I fired I just saw Wayne kindo' stagger back and forward and then staggered and fell within about a foot of the hind wheel of the car; Wayne was at the back end of my car when the shot hit him; I fired another shot to keep Merle in the filling station. I did not know what he had gone back to the station for. The second time I shot over the back end of the car, kindo' out toward the middle of the street; I then walked around the back of the car and stepped over Wayne and up to the front of the car and shot again; I was facing east when I shot the last time; I shot because I saw something moving in the filling station. I was five or six feet from Wayne at the time I fired the last shot, I wasn't aiming at Wayne or anything; I did not stop my motor when I drove up to the filling station for the reason I did not figure on staying there but a little bit; when I shot the third shot Ed Spencer was standing in front of the car; I stepped back to the west side of the car and got in and drove off, Spencer hollowed wait a minute, but I just kept going.

"I went home and in just a little while the officers came and got me. Charley Lauder came in a different car; Elmer Finley, one of the officers, asked me where the gun was and I tried to tell him, but I could not speak very loud, and my wife spoke up and said it was in the house. Dr. Taylor had been treating my throat; after I was in jail Dr. Kerley was called to treat my throat; I could not talk as good as I can now, nor could I talk as good the date of the tragedy as I can now."

On cross-examination defendant stated he was 38 years old:

"Have known the Butterfield family since I was a child; have associated with the deceased since he was a child; we lived about two block apart; I have never had any difficulty with Merle; I don't recall how long it has been since I had seen Wayne prior to the day of the trouble. I saw him at Ada Hooks' that day; she is a negro woman living in the northeast part of Anadarko; I went there looking for Sam Sercy, a colored man about 45 or 50 years old. When I got there Thelma Moran and a man they have here as a witness, I can't recall his name, and a boy by the name of Kirk was down there; I did not see Thelma Moran go to Ada Hooks' place with Wayne; Wayne pulled a knife on me at Ada Hooks' place, and cursed me, and a negro man interceded; I don't know his name, he stays around the Teeters place. I saw a negro known as Boll Weevil there at Hooks' place, but I do not know whether he was on the inside or the outside. Ed Spencer went with me down there; we left around 2:30 or 3 o'clock, some time after noon anyway. There was some drinking while I was there, and as I started to leave Wayne stopped me and asked me about a gas bill which he claimed I owed the Skelly filling station, where this trouble occurred; I told him I did not owe $11.60, that I had paid $5.00 on the bill to a boy named Clark; I told Wayne I did not have the money to pay; he said, 'You are a God damn liar'; I said, 'if I had the money I would not pay it to you, I would pay it to Merle,' and he said, 'You would not pay it regardless of how much money you had'; I told him not to start trouble down there at this place, he was talking pretty loud and pulled his knife, and appeared to be drunk; the only thing I know of that caused him to curse me was this gasoline bill. When we left there Ed was driving the car; when he got in the car Wayne had quieted down and was not raising any disturbance; I thought I saw my mother's car parked near my house, and Wayne did not want to go in the presence of my mother, neither did I; I was not drunk.

"I afterwards went to Huett's to look at a team of mules; Wayne got out of the car at the Smiley barbecue stand located in the north part of town near Hooks' place; I was at Huett's quite a little while; I did not discuss with anyone the trouble I had had with Wayne; it made me a little bit mad, I did not want to do anything to injure him and thought it would soon blow over; I went from Huett's to my home; there was no one at home but my wife and she was crying when I went in the house. A chair was broken up, my wife's shin was bruised and there was a bruise on her knee and her stocking was torn on down to her foot. She told me Wayne had come down and had insulted her, tried to force her into sexual intercourse; they had scuffled around and she had finally gotten away from him. I did not call a doctor to treat my wife; if she called a doctor I do not know it.

"When my wife told me what Wayne had done it did not make me mad enough to kill him; I did not have any intention of killing him over that; what had occurred at my house did not cause me to want to kill Wayne; I did not leave my home intending to kill him. The difficulty did not occur over the trouble I had had with Wayne at the Hooks' place, or what my wife said he had done down at my place. I took the gun along for protection if I ran into Wayne, I was going to use it in case he did just what he did; was not looking for Wayne, and did not even expect to find him at the filling station. I did not tell the officers anything about what had occurred at home; I was mad when I left home, not too mad, after my wife had told me what had happened at home, and started down to see Merle.

"Ed Spencer was not with me when I left my house, but I picked him up across from Merle's filling station at the Fanning hamburger joint, and drove down town and he went in and bought some shells and I put five in the gun. We then drove around to the Skelly filling station; I did not know Wayne was there. I went to town for the purpose of seeing Merle and expected to see him at the filling station; when I drove up Merle came to the door

of my car, and I said, 'Merle, Wayne has been down to the house raising hell'; and he said, 'What in the name of hell has he done now.' About that time Wayne came out of the filling station office; Merle said, 'Wayne get back'; he kept coming and I grabbed my gun; I did not ask Merle where Wayne was, nor did I say I am going to kill the son of a bitch. I took this gun with me in case I ran into Wayne and he jumped me up I wanted to be prepared; I did not drive away when I saw Wayne coming out, nor did I make any effort to avoid trouble.

"Wayne came out of the filling station and Merle was going into the filling station, and he circled around Merle and came around the back of my car and I could not see what he was doing; I shot him because I thought he was going to shoot me the minute I stepped out of the car; I shot without seeing him do anything toward injuring me; he was coming all the time and he was told to go back and it looked to me like he was trying to kill me. When I fired the second shot Wayne was on the east side of the car and I fired over the back of the car."

Witness further stated he did not expect to have any trouble when he went to the filling station; he went there for the purpose of telling Merle to tell his brother Wayne to stay away from his home; defendant stated when the deceased came out of the filling station he came toward him and he believed he was going to do him bodily harm, but he did not see him have a gun in his hands; that he was pulling up on his sweater like he was trying to get hold of something.

Gertie Orme, wife of the defendant, testified for the defendant:

"That the difficulty occurred on Sunday, the 22d of March, 1936. I had known Wayne Butterfield for a long time; he had visited in our home. Ed Spencer and my husband left shortly after noon to go hunt a colored man; after they left Wayne Butterfield came to our house

and asked me about a receipt for a payment on a gasoline bill; I told him I did not know anything about it; he had a part of a bottle of whisky in his pocket and pulled out and offered me a drink, and I did not take a drink. He turned and grabbed me and turned me around and said, 'I know what you will do'; I began fighting him and tried to get away from him and he ran over a chair; he bruised me and scratched me, but I finally got loose and ran around the table and he ceased to struggle with me, and did not try to trouble me any more; I told him I was surprised at him acting as he did, as I did not think he was that kind of a boy; he did not say anything, just kindo' straightened his clothes; he said he had already had trouble with Norman over this gasoline bill, and when he got ready to walk out of the door he said it won't be good for you to tell Norman anything about this because there will be some kind of trouble over it, or made some threat of some kind. When he left he went toward town; he met my boy up the street and caught him by the arm and kindo' kicked him a little, I do not know why. In the scuffle my left hand was bruised when we ran into the chair and turned the chair over, and it skinned my shin and tore my hose all down this leg here; my shin bled and other places were just bruised.

"My husband came home shortly after Wayne left. I was crying when he came in and trying to doctor my shin, and he asked me what was the matter. I hesitated because I did not want any more trouble. I told him what had happened, and he said he was going up and have Merle keep Wayne away from our house. Wayne was evidently drinking or something was wrong with him. I told my husband Wayne had made a threat to cause more trouble over it, and got his gun and gave it to him and told him he had better be careful; he took the gun with him.

"My husband's throat was very bad, he nearly lost his voice; part of the time you could not hear him talking. The officers came down and arrested my husband, and Mr. Finley, the sheriff, asked where his gun was. I was

standing beside Norman where he was sitting on the porch, Norman told him where the gun was, but the sheriff did not understand him and I repeated it for him. His voice is some better now than it was then."

On cross-examination witness stated:

"She had been married 20 years the 12th of last March; I do not remember when I got acquainted with Wayne Butterfield, it has been several years; during our acquaintance he had never said anything like he did that afternoon. So far as I know my husband had nothing against Wayne Butterfield. I gave him the gun when he started away; he did not say anything about shells for it; he did not say anything about going to kill Wayne. After he had had the trouble my husband came home between 3:30 and 4 o'clock. I don't remember making any statement in the presence of Mr. Lauder that I did not know why in the world my husband had shot Wayne Butterfield; I knew nothing about their having any trouble outside of what he had done down there at the house. I did not tell Mr. Lauder about that. Mr. Buck came down to ask me some questions; he did not ask me if Wayne Butterfield did anything to me or attacked me; I told him I did not have anything to say, that I was all torn up and my nerves was all in pieces and I did not want to talk to anyone."

George Hensley testified for the defendant and stated: He lived at 405 East Main, Anadarko, Okla., he knew Ed Spencer and knew where the Hooks place was located:

"I recall the day Wayne Butterfield was shot; I saw Wayne and Norman Orme on the porch at Ada Hooks' place; the porch is about eight foot square, or eight by ten; when I heard them talking I was just outside in front and was going down the sidewalk; my attention was attracted by the talk, Mr. Orme and Mr. Butterfield had one another around the shoulder and Butterfield had a knife, and told him he was going to kill him, for two cents he would cut his throat. I heard Orme say something but could not understand him, he talked down his throat or

something. This fellow Spencer came out of the door and quieted them down; it seems Spencer had the car keys; they got in the car, all three together, and drove off. I was just passing the Hooks place taking a razor down to Mr. Pettigrew to have it honed."

Ada Hooks testified to the parties being at her place, and several other witnesses testified to matters of no importance so far as the actual facts leading up to the difficulty, and it is not deemed necessary to set out in full all of the questions gone into by the state and defendant not material.

The defendant has assigned eight errors which he alleges are sufficient to warrant this court in reversing the case and granting him a new trial. The defendant demurred to the information, which demurrer was overruled, and also filed a motion to quash the jury panel, which was overruled. In his assignment of errors and his argument in his brief, which contains 126 pages, he does not press the question of the action of the court in overruling his motion to quash the panel of the jury or his demurrer.

The first assignment argued by the defendant is that the court erred in refusing to give to the jury the instruction requested by the defendant, which instruction is found on page 426 of the case-made. A careful reading and study of the requested instruction shows that the instruction requested is not predicated upon the facts proven by the state or by the testimony of the defendant; citing in support of his contention Brock v. State, 6 Okla. Cr. 23, 115 Pac. 1026, and Wilkerson v. State, 37 Okla. Cr. 43, 256 Pac. 63, and many other authorities. The court did not err in refusing to give the requested instruction.

There is no dispute that in the trial of a criminal case the defendant has the right to have a clear and affirmative instruction given to the jury applicable to his testi-

mony based upon the fact that his testimony is true, where the testimony of the defendant affects a material issue in the case. The instructions of the court, considered in their entirety, clearly state the law applicable to the facts, and the instructions are as fair to the defendant as they are to the state. The substance of the testimony set out in this opinion clearly shows that on the day of the killing the defendant and the deceased had been over to a negro's house and started to drive to the defendant's home, claiming that before they reached his home he saw a car at the defendant's home which they thought was his mother's; neither the deceased nor the defendant wanted the mother to see them; they drove around a short distance and the deceased got out of the car and the defendant and Ed Spencer drove to Mr. Huett's home and was there a short while, and Ed got out of the car and the defendant drove to his home, where he claims he found his wife crying, and she told him what the deceased had tried to do to her; her shin was skinned and her hose torn, and her knee bruised in the scuffle. The defendant stated he was going to see the brother of the deceased, Merle Butterfield, and tell him to keep Wayne away from his house; that the defendant got in his car and says his wife told him Wayne threatened trouble if she told her husband what had taken place, and that he had better take his gun along for his protection; defendant says he did this, and after he started he picked up Ed Spencer and drove down to a hardware store, Spencer went in and bought some shells and brought them to the defendant, and the defendant loaded his pistol and drove from there to the Skelly filling station, where he found Merle Butterfield, L. H. Conner, and Coy Lyon.

At this point the testimony becomes conflicting. The substance of the testimony of Merle Butterfield shows

the defendant drove up and asked where Wayne was, and Merle Butterfield told him Wayne was in the filling station; the defendant then stated he was going to kill the son of a bitch; Merle talked to the defendant, and Wayne came out of the filling station and Merle told him to go back, that defendant had a gun; Wayne continued to come out toward the car in which the defendant was sitting and said, "Tangle (using the defendant's nickname) you won't kill anyone," and kept on coming toward the car, and the defendant got out, picked up his gun, and shot the deceased. He then fired a second shot and walked around the car and stepped over the legs of the deceased where he was lying on the ground mortally wounded, and fired another shot into the ground. Eye-witnesses state that he fired a shot at the head of the deceased. The defendant admits firing all of the shots, but says he did not fire at the head of the deceased.

That part of W. A. Butterfield's evidence when the deceased was lingering, where he said he did not understand why it was the defendant shot him, as he had never had any trouble with him, he did not know the defendant had anything against him, and that he did not have anything against the defendant, was properly admitted as a dying declaration; but the defendant insists that the following statement of W. A. Butterfield was not admissible as a dying declaration:

"Q. Just go ahead and tell what he told you there in that statement? A. Well, he said—he started to tell—he says, 'Dad, I just can't understand it. I have never had any trouble with this fellow and I did not think he had anything against me'; and he just says, 'I know I didn't have anything against him,' and then he went right ahead telling me about taking a gun away from this fellow. Q. Tell what he said. A. Well, he said he and Norman had an argument over a bill that he owed down

at the filling station and he said he asked Norman why he did not pay it, and he said he started an argument and Norman got mad and drew a gun on him, and he took the gun away from him and gave it to his wife."

On cross-examination the witness was asked:

"Q. Do you know when the occurrence he referred to of the gun, occurred? A. No, I could not say. Q. Did he make any claim it occurred there at the time of the shooting? A. No. Q. You did not understand him to mean it occurred there? A. No. Q. It occurred previous to that, is that correct? A. I suppose so, he did not say."

It is urged by the defendant that the testimony was improperly admitted as a dying declaration, and he cites in support of his contention Wratislaw v. State, 18 Okla. Cr. 150, 194 Pac. 273; 1 Ruling Case Law 353.

The state argues in its brief this testimony was admissible as a dying declaration, and cites many authorities in support of its contention. However, upon examination of the authorities cited by the state, which include Freels v. State, 18 Okla. Cr. 456, 195 Pac. 1094, we fail to find the authorities cited sustain the contention of the state, and the statement the witness claims the deceased made to him was made without giving any date or time when the trouble should have occurred and the gun was taken from the defendant.

After a careful examination of the testimony in the case we fail to find any reason to justify the state in desiring to prove the statements claimed as a dying declaration, for the reason that all of the other testimony of the state absolutely contradicts the statement attributed to the deceased. All of the state's testimony shows that prior to the time of the shooting the deceased and defendant had been to Ada Hooks' place, and the state's witnesses claim the deceased and the defendant did not

have any trouble, and there was no proof on the part of the state or the defendant that the defendant had a gun with him that morning. This statement is too remote and did not strengthen the evidence of the state. Considering all the testimony in the record, the admission of the testimony by the court was not sufficiently prejudicial to the defendant to warrant this court in reversing the case on that ground. A dying declaration is admissible when made under the belief of the deceased that death is impending. There should be some definite time given when the dying declaration was made by the injured party so the defendant could have an opportunity to meet the same by showing the true state of the deceased's condition at the time it is claimed the statement was made.

The argument upon this question by the defendant and the state is able and lengthy, but it is not deemed necessary to discuss this question further.

The defendant insists that the verdict of the jury is not sustained by sufficient evidence and is contrary to the law. With this contention we cannot agree. The evidence in this case on behalf of the state shows the defendant drove to the filling station and found the deceased and killed him in cold blood; the deceased having no opportunity whatever to defend himself or avoid being killed. The defendant himself admits that the deceased, so far as he knew, was not attempting to do him any personal injury, but gives as the reason for shooting the deceased, the deceased continued to come on up toward the car. The question of self-defense has been argued by the defendant, but in the view we take of this record the defendant deprived himself of any right of self-defense, and in fact all of the testimony conclusively shows that no assault was made upon the defendant, or attempted, and that if any

supposed injury existed, it existed in the mind of the defendant without any overt act or demonstration upon the part of the deceased, and that the defendant took the life of the deceased without any justification.

The question of the sufficiency of the evidence is a question for the jury. In Tillery v. State, 23 Okla. Cr. 226, 214 Pac. 198, this court, in the second paragraph of the syllabus, held:

"When the sufficiency of the evidence is challenged, and the evidence as a whole does not satisfactorily or conclusively convince the appellate court of the guilt of the accused, the verdict will not be set aside on the ground of insufficiency of the evidence where, as in this case, there is some substantial evidence tending to support the verdict. The weight of the testimony and the credibility of the witnesses is for the jury."

Where the evidence and reasonable and logical inferences and deductions to be drawn from it are sufficient to convince the jury beyond a reasonable doubt of the guilt of the defendant, this court will not disturb the verdict for insufficiency. Pickett v. State, 35 Okla. Cr. 60, 248 Pac. 352; Humberd v. State, 56 Okla. Cr. 23, 32 Pac. 2d 954.

The jury is the exclusive judge of the weight of the evidence, and if there is a clear conflict in the evidence, or it is such that different inferences can properly be drawn from it, this determination will not be interfered with unless it is clearly against the weight of the evidence, or it appears to have been influenced by passion or prejudice. Choate v. State, 37 Okla. Cr. 314, 258 Pac. 360; Clemmer v. State, 56 Okla. Cr. 354; 40 Pac. 2d 37; Fred Houston v. State, 63 Okla. Cr. 49, 72 Pac. 2d 526; A. G. Goodnight v. State, 62 Okla. Cr. 382, 71 Pac. 2d 789, and John Coppage v. State, 62 Okla. Cr. 325, 71 Pac. 2d 509.

There is nothing in the record to show that the verdict of the jury is against the weight of the evidence; nor is there anything in the record to show that the jury was influenced by passion or prejudice. The evidence is sufficient to sustain the judgment. The jury was extremely lenient with the defendant, and the defendant was fortunate that the jury did not return a verdict of murder, as the facts in the record would have justified.

This case has been ably argued by counsel for the defendant, and in support of their argument they have filed a brief containing 126 pages. The state, through the Attorney General, has presented an able argument in a brief containing 39 pages.

There are other errors assigned and argued by the defendant, but they do not possess sufficient merit to warrant a reversal. The defendant was properly tried, and the court's instructions correctly advised the jury as to the law applicable to the facts, and are as fair to the defendant as they are to the state. There are no errors in the record that would warrant this court in setting aside the verdict of the jury and the judgment of the trial court and reversing this case.

The judgment of the trial court is therefore affirmed.

DOYLE and BAREFOOT, JJ., concur.