## AKINS v. STATE.

No. A-11078.   March 1, 1950.

(215 P. 2d 569.)

48

Sam Y. Colby, Madill, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty Gen., for defendant in error.

BRETT, J. Earl Akins, defendant below, was charged by information with the crime of murder. It was alleged he killed his son-in-law Monroe Pierce on September 1, 1947, in Kingston, Marshall county, Okla.

The crime occurred in Pierce's living room just after dark. There were only two competent eyewitnesses to the killing, the defendant and his daughter, Mrs. Pierce, wife of the victim of the crime. Mrs. Pierce testified for the state. She was unwilling, unco-operative and all but hostile.

The state's evidence discloses that Pierce and Akins were partners in the operation of a beer parlor about a mile east of Kingston. The parties lived in Kingston in the Pierce home. The defendant Akins stayed with them, and had done so for several years, but when they established the beer parlor Akins started staying there at nights. It was suggested by Pierce that Akins take his pistol with him and keep it with him there for protection against robbery. It appears, however, that this suggestion was never heeded and on the night of the killing the pistol was in the wardrobe top drawer. In operating the beer parlor, Pierce had permitted gambling at the place and the defendant objected. They were therefore in disagreement and not getting along well. Akins testified he objected because he was afraid they would lose their beer license if it continued. Apparently it was profitable to Pierce to let it continue, and it appears he wanted it so to do. On the evening in question Pierce came home and left, hunting for Akins. Just before he left Pierce said to his wife "Well, you have to choose between me and your daddy". Shortly thereafter Pierce and defendant returned together. They had a discussion about dissolving the partnership. They figured awhile and the defendant Akins paid his son-in-law Pierce about $38. The record is not clear as to who sold to whom or who bought out whom. But the partnership was nevertheless dissolved. During the argument about the poker game and the settlement, the defendant Akins used pro-

fane language in the presence of Pierce's two little children, 6 and 3, and Pierce rebuked him for it. Thereafter, Pierce told the defendant Akins "Well, your plate is broke", meaning that he was through eating at Pierce's table. He also told him to get his stuff and get out. In response to this, the defendant went into the bedroom and returned with his pistol in his right hand. Mrs. Pierce said that her husband had brought some carpenter tools home Sunday the day before the killing. She said that when her father came back with his pistol instead of him leaving as he had ample time to do, he continued to argue about the beer parlor. While the argument ensued her deceased husband picked up a hammer and attacked the defendant with the hammer. She was between them and Pierce pushed her away and said "let me to him". Her father had started out and was standing in the front door. When Pierce rushed him Akins fired and went out the door. Pierce, dropping the hammer in the living room, followed him out into the yard where he fell to the ground and died from wounds in the abdominal cavity on the left side 45 minutes later in the Madill hospital. Mrs. Pierce said she later put the hammer on the icebox or on the shelf in the kitchen. The day following the shooting she said she came into the house and saw the hammer lying on the floor. She said she didn't know whether that was the same hammer or not. (It is interesting to note that the hammer was never found or produced as evidence by the defendant.) Mrs. Pierce further testified that she didn't know what became of the hammer. In this connection, on the habeas corpus hearing to determine the defendant's right to bond, Mrs. Pierce testified that she could not swear whether her deceased husband had a hammer in his hand or not, that she did not see any. The state offered this evidence on the ground of surprise for impeachment and

to counteract the injurious effect of her testimony, and the trial court erroneously excluded the same. The only thing to contradict the claim of surprise was the unsupported statement of counsel for the defendant that the county attorney could not plead surprise. It was competent and material and from the state of the record should have been admitted, particularly in view of the fact that the defendant offered no factual evidence to refute the claim of surprise. This court has held that:

"Where a party has placed a witness upon the stand, having reason to believe that he will testify to a given state of facts, and the witness then testifies to a different state of facts, the party calling him as a witness may show his previous statements for the purpose of affecting his credibility and to explain the reason for placing him on the stand and to counteract the injurious effect of his testimony.

"A witness' prior contradictory statement when introduced is to be considered only for the purpose of impeachment and to explain the calling of such witness. It cannot be used as substantive testimony tending to prove the truth of the facts stated. The court, by proper instruction, should limit the application of such testimony to this purpose." Dunham v. State, 78 Okla. Cr. 54, 143 P. 2d 834, 835. Foreman v. State, 38 Okla. Cr. 50, 259 P. 176; Donahue v. State, 38 Okla. Cr. 87, 259 P. 179.

So limited, the evidence of Mrs. Pierce given at the habeas corpus hearing, was admissible for impreaching purposes. Not to so hold would obviously constitute a perversion of justice. After all what the law seeks to ascertain in the administration of justice is the truth, and justice can be predicated upon no other basis. Courts should never permit deceit to defeat ascertainment of the truth. For the foregoing reasons the tendered evidence was admissible.

Sheriff Hargis testified that immediately following the killing he picked up the defendant, and the defendant told him that the shooting occurred over "just as near nothing as could possibly be". He said the defendant at no time said anything to him about being attacked with a hammer. He testified he took the defendant to the residence and made an investigation, and that he did not see a hammer on the floor. He said he did find the gun in the wardrobe dresser where the defendant showed him it was. The foregoing is substantially the state's case in chief.

The defendant's plea was self-defense. He testified in his own behalf that the day before the killing Pierce had done some repair work at the beer parlor and brought his tools home and left them in the living room. These tools consisted of a hammer, saw and a square. He said a few nights before that he came into the beer parlor and found a poker game going on. He told Pierce that that would not do, that they would lose their license. He said Pierce said to him "I will take care of that, the license is on me". He said Pierce did not like what he said about it. On Monday, the day before the shooting, the defendant was at the Smith Domino Parlor, and the deceased Pierce called him from the back door and said "I have a little business with you". He got up and met him. Pierce took hold of his arm and they walked about 10 steps from the building and Pierce told him he wanted a settlement out of the beer parlor business. They started for Pierce's home to work out the settlement. On the way home the defendant continued to argue about the poker game and the fact if it was continued they would get closed up. Upon arrival at home they got the bills, receipts, etc., and made a settlement. They did not argue much about the deal according to the defendant. De-

fendant Akins said he wound up the deal by paying Pierce $38.85. He said they got a gun for him to use at the beer parlor against hi-jackers. The defendant said he then got up and went into the bedroom and got his gun, saying in substance, if he was going out there alone "to stay out there from now on, I will take this gun and walk on out there". (It is pertinent to observe here that the defendant had at no prior time deemed it necessary to take the gun with him.) Pierce said, "you are taking the gun, you just as well get your other things, too. I don't want you around here. Your plate is broke", meaning he said, he was no longer welcome around there. Instead of leaving, he said he stopped and told Pierce that he was there because Pierce and his wife, his daughter, had asked him to stay, when he planned to go to California, and Pierce was going up to Woodward, Okla., to work. Pierce said he wanted him to stay with his wife, the defendant's daughter, while he was away. He was assured his board would not cost him anything. Thereafter the argument about the gambling started over again. The defendant contended that since the license was in Pierce's name and everybody believed that Pierce was the owner, that for him as a hired hand to try to stop the gambling would brand him among their customers as a "damn heel". He said Pierce rebuked him for cussing before Pierce's children. Mrs. Pierce asked them not to have a racket, he said, and he told her he was not, and at that time Pierce approached him with a hammer in his hand and said "let me to him, I will tear his head off". Coming at him in a low crouch, armed wth a hammer he became afraid. He jumped back, intending to back out the door, instead he backed into the door facing. He said this threw him back in the room a little piece. Pierce was about three feet from him and he shot once. Pierce straightened up. The defendant said he ran out the door

and Pierce followed him. Pierce fell on the ground in the yard and lay on his back. He took the pistol back in and put it in the dresser drawer. Thereafter he tried to help his daughter with her dying husband. On cross-examination he testified he had, never had the gun out at the beer parlor. He said somehow or other he hadn't thought about it when he was around home. He further said the only time he tried to back out the door was when the deceased came at him with a hammer. (Thus it appears from his own testimony that he had plenty of time to get away and avoid the necessity of having to use the pistol.)

Tom Gresham testified for the defense that the deceased passed him a short time before the killing hunting for the defendant saying to him "he wanted to see that man, I am going to kick the seat of his pants up on his shoulders". He said the deceased did not tell him why he wanted to do it.

Raymond Smith, who ran the domino parlor where the deceased found Akins, the defendant, testified for the defense that he came in and said he wanted to speak to Akins when the domino game was over. He said Pierce did not seem angry to him, that if he was he could not tell it.

Sid Cunningham, who was playing partners with Akins in the domino game, testifying for the defense, said that Pierce came in, got Akins by the arm and said "I want to talk to you", and they left by the back door. He said he did not pay much attention, and he did not know if Pierce was in a bad humor. There was other evidence offered on behalf of the defendant and the state by other witnesses of little if any importance.

It is apparent that there are conflicts in the foregoing evidence. It is not denied that Pierce's death was the result of the gunshot wound inflicted upon his body by the defendant Earl Akins as a result of the disagreement between them about the beer parlor and its operation and the resulting altercation. The evidence is in conflict relative to the deceased Monroe Pierce being armed with a hammer. It is well that we summarize the conflicts that appear in the evidence going to the defendant's plea of self-defense. First, we must bear in mind that the defendant told Sheriff Hargis the killing occurred over about as little as could be possible. Mrs. Pierce, a very unwilling if not hostile witness, testified she accompanied her husband to the hospital. It appears that she did not return to the house until the next morning. She said upon entering she saw the hammer on the floor in the living room. She could not remember what she did with the hammer, and could not find it after she mislaid it. To the contrary, Mrs. Sam Murr, who cleaned up the house the next morning after the killing the preceding night, said there were no hammers around the house. More strongly to the contrary, Sheriff Urkle Hargis, who was there and made an investigation of the premises the night of the killing, saw no hammer in the living room where Mrs. Pierce said she saw it the following morning. Moreover, if the defendant was attacked as he claimed he was, he would not have made the statement it happened over as little as could be possible. Furthermore, if he had been attacked as he contends, would he not have mentioned that fact to the sheriff upon being taken into custody? Also, when they were at the house to get the gun, if the defendant had been attacked with a hammer, is it not reasonable that he would have pointed out the hammer on the floor to the sheriff if one had been used in the attack and left there as he contended at the trial?

Is it not reasonable to believe that if such had been the case he would have delivered the instrument used by his assailant along with the gun that he used in his defense? The important question as to the defense in this case is, Was there any hammer involved in the case? The foregoing factual conflicts presented an issue for the jury. They decided it against the defendant. The evidence was sufficient to support such finding. Counsel for the defense apparently thought so too or he would have demurred to the evidence. This he did not do. On such an issue only recently, in the case of Neill v. State, 89 Okla. Cr. 272, 207 P. 2d 344, 345, this court said:

"Verdict of jury in homicide case based upon conflicting evidence will not be disturbed on appeal on ground that the evidence is insufficient to sustain the judgment."

Also, in Walker v. State, 89 Okla. Cr. 284, 207 P. 2d 341, 342, we said:

"Where the evidence is conflicting and different inferences may be drawn therefrom, it is the province of the jury to weigh the same and determine the facts.

"The function of the Criminal Court of Appeals is limited to ascertaining whether there is a basis, in the evidence, on which the jury can reasonably conclude that the accused is guilty as charged."

The contention in relation to the insufficiency of the evidence is therefore without merit.

The defendant further contends that it was error to permit the funeral director Wendyl Watts to testify to the location of the gunshot wounds that killed Pierce. This contention is likewise without merit for the reason that the fact of the killing was admitted by the defendant Earl Akins, and evidence as to the range of the bullet was not an issue. The lack of merit as to this contention is apparent.

Next, the defendant contends that hearsay evidence was permitted to be offered by the state. An examination of the record discloses in a few instances this was true, which was error but harmless, since it was not as to a material matter and of such nature as contributed to the jury's verdict of guilty. The one instance particularly complained of by the defendant was when the sheriff was told there had been a shooting scrape. The fact was there had been one admittedly by the defendant. This evidence while hearsay was not as to a material matter which contributed to the verdict of guilty. Where such evidence is so material it contributed to the verdict of guilty, the same constitutes reversible error. Smith v. State, 59 Okla. Cr. 312, 58 P. 2d 347; Brokhaus v. State, 11 Okla. Cr. 625, 150 P. 510. But such evidence is not error unless it appears the defendant was injured thereby. Russell v. State, 41 Okla. Cr. 71, 270 P. 339; Winfield v. State, 18 Okla. Cr. 257, 191 P. 609. There being no injury, for this reason in this case this contention is without merit.

The defendant further contends that the trial court unfairly restricted him in the matter of cross-examination of Mrs. Pierce, the state's chief witness. This contention is predicated upon the proposition that the court would not let defense counsel ask leading questions on cross-examination. In this connection, an examination of the record discloses that in several instances the question had already been answered before the court sought to restrict counsel for the defendant. In those instances the objective of the cross-examination had been realized. In other instances, the record reveals that where the court sustained objections to what was competent evidence, counsel re-framed his question and got the desired answer. Hence, under these conditions the defendant suffered no

injury. This court has repeatedly held that the scope of the cross-examination of a witness is largely a matter of discretion with the trial court, and that the burden is upon the appellant to show that the trial court abused its discretion. Winfield v. State, supra; Ralston v. State, 54 Okla. Cr. 408, 22 P. 2d 1038, wherein this court said "under such conditions to warrant a reversal it must clearly appear the court abused its discretion". This record does not disclose an abuse of discretion warranting a reversal of the case in this regard.

Next, the defendant complains of the opening statement of the county attorney to the effect that the defendant had been on a protracted drunk and that he offered no proof in support thereof. The record fails to reveal why the county attorney did not present this evidence. It was so pertinent to the defendant's state of mind that it would have been admissible. But the record does not show the statement was not made in good faith. From an examination of the whole record in this case, we are of the opinion the defendant was not prejudiced by the statement of the county attorney. In Lee v. State, 67 Okla. Cr. 283, 94 P. 2d 5, this court said:

"Ordinarily, error cannot be predicated upon the opening statement of a prosecuting attorney to the jury, specifically stating what facts he expects to develop in testimony, where later, for some reason, he fails to introduce evidence to support some of the narrative related in the opening statement, unless such unsupported portions of the opening statement were made in bad faith and were manifestly prejudicial."

In Guest v. State, 56 Okla. Cr. 129, 34 P. 2d 1082, it was held:

"An opening statement is, and purports to be, no more than an outline of the state's theory and the evidence expected to be offered in support. The statement of in-

competent or immaterial matter affords no ground for reversal unless it appears that the statement was manifestly prejudicial."

Under this record the defendant's guilt is clear and his plea of self-defense unconvincing. The verdict fixing the punishment at four years certainly is indicative of the fact that the defendant was not prejudiced as the result of passion engendered by the opening statement.

Finally, the defendant complains of the opening argument of the special prosecutor employed by the decedent's brothers, and the closing argument of the county attorney. The special prosecutor's argument contained the statement "this whole thing was prefabricated from one end to the other". The defendant objected, his objection was overruled and an exception allowed. The closing argument of the county attorney contained the statement "the evidence further shows that after it was all over, the evidence shows that he met some fellows out in front there, and went to get a pint of whisky. Earl Akins did that 15 or 20 minutes after he had shot this man". Upon the county attorney making this statement the court did not wait for the interposition of an objection but immediately reprimanded the county attorney and admonished the jury that there was no such evidence in the record and that they were to disregard it, and the county attorney apologized. The foregoing statements were highly improper and were not warranted by the evidence. In Sweet v. State, 68 Okla. Cr. 44, 95 P. 2d 242, 243, this court held:

"It is the duty of the county attorney in his opening statement and closing argument to the jury to confine himself to the facts as shown by the evidence. But they have the right to draw their deductions and conclusions, and unless the statements or arguments are such that deprive a defendant of his substantial rights, or are such that would arouse the passion and prejudice of the jury

to the extent that they would be swayed from arriving at a just verdict, the judgment and sentence will not be set aside on appeal."

It was error for the trial court not to sustain the objection of the defendant to the statement of the special prosecutor, but harmless error in view of the conflict in the testimony of Mrs. Pierce given on the trial and in the habeas corpus hearing, hereinbefore discussed. As to the statement of the county attorney, had the court not stopped counsel and admonished the jury to disregard the same, the jury might have been influenced by the unwarranted statement of the county attorney and it might have tended to arouse the passion and prejudice of the jury. The court however is of the opinion that the statements contained in the county attorney's opening statement, the special prosecutor's opening argument and the county attorney's closing argument did not sway the jury from arriving at a just verdict. It is inescapable that the defendant admittedly killed Monroe Pierce, that his plea of self-defense under the conditions herewith presented is weak and unconvincing. Under the conditions, it is clear that the verdict is right. Even if the things complained of had not occurred, the jury could not have reasonably returned a different verdict. Had it not been for the able and persistent representation of counsel for the defendant, he would have suffered a greater penalty. We are of the opinion the facts would have sustained a greater penalty. The defendant makes other assignments of error which we do not believe to be of importance. The errors complained of by the defendant, in light of the entire record, fall within the provisions of Title 22, § 1068, O. S. A. 1941, reading in part as follows:

"No judgment shall be set aside or new trial granted by any appellate court of this State in any case, * * * on the ground of * * * the improper admission or rejec-

tion of evidence, or as to error in any matter of * * * procedure, unless, in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

For all of the above and foregoing reasons, the judgment and sentence herein imposed is accordingly affirmed.

JONES, P. J., and POWELL, J., concur.