# FLEETWOOD v. STATE.

No. A-11455. March 5, 1952.

(241 P. 2d 962.)

Hickman & Hickman, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Ass't. Atty. Gen., for defendant in error.

BRETT, P. J. Plaintiff in error, Rollie Fleetwood, was charged by information in the district court of Tulsa county, Oklahoma, with the crime of murder

committed in said county on his 72-year old father, Sherman Fleetwood. The offense was alleged to have been committed some time during the day on Sunday, December 25, 1949, by means of three shotgun wounds. The scene of the crime was the Sherman Fleetwood farm, a few miles south east of Bixby, Oklahoma, in Tulsa county. The defendant was tried by a jury, convicted and his sentence fixed at the death penalty, and judgment and sentence entered accordingly. From the sentence so imposed this appeal has been perfected.

The record contains 861 pages. Evidence of 21 witnesses was introduced on behalf of the state. The defendant offered the evidence of 10 witnesses, and the state presented 5 additional witnesses in rebuttal. This appeal was lodged on June 15, 1950, but the briefs have just recently been filed. Though the record is long and tedious, our task has been materially lessened by the excellent briefs of both the Attorney General and counsel for the defendant. Nevertheless, in some regards, the record is most difficult to follow, since a plat was used and certain points and positions located thereon but no marks were made to confirm the indications, so as to enable us to follow the points and positions pointed out, or indicated by the witnesses. Furthermore, it is no easy task to condense such a record. In any event, we shall not attempt to detail all of the evidence contained in the record but shall be content to recount such portions of the story as is necessary to delineate the salient features of the case.

In the outset of his argument, the defendant's counsel state that the trial court was correct in its refusal to instruct the jury on any ground other than that of murder. With this conclusion we are in complete agreement. The case presents one of murder or not guilty at all. Moreover, in his argument counsel for the defendant states that the evidence is entirely circumstantial. With this statement the state takes issue, and rightfully so. The evidence is not entirely circumstantial, though a considerable portion thereof is of such a nature.

As hereinbefore indicated, the murder of Sherman Fleetwood occurred some time during the day on December 25, 1949, on the old family allotment. It appears that the house had burned down in the summer of 1949 before the killing. The defendant, Rollie Fleetwood, lived a mile south and a mile west of the old family farm. Both the old place and the defendant's home were Indian allotments. The old place was allotted to Mrs. Fleetwood and the Rollie Fleetwood home was allotted to his sister. When the house on the old family place burned, the decedent Sherman Fleetwood and his wife moved in with their daughter Mrs. Ray O'Hern, whose farm was 3 miles south and 3 miles west of the farm occupied by Rollie Fleetwood. After the house burned, Sherman Fleetwood continued to keep some livestock and some chickens at the old place. It was his custom to return every day and tend the stock. In so doing and in coming from O'Hern's place in his Packard automobile, he had to pass by the defendant's home. It appears from the record that the defendant was a heavy drinker, particularly, defendant had drunk heavily on Christmas Eve and Christmas morning preceding the killing. He would consume one quantity of whiskey and when the supply was exhausted, he would immediately replenish the supply and continue drinking. But the record shows that drunkenness could not be ascribed alone as the cause of the crime, for there was bad blood between the defendant and his father.

As early as 1942, the defendant came upon the decedent Sherman Fleetwood and Ray O'Hern, defendant's brother-in-law, in a lumber yard where they had gone to get some lumber. Rollie Fleetwood was drinking then and asked his father Sherman Fleetwood for some money, after which an argument ensued. The defendant, O'Hern testified, threatened to kill the old man and finally

struck O'Hern before he got away from there. The old man escaped into a cornfield, finally returned, and went home with O'Hern. Then about August 8, 1949, the defendant blocked the road with his automobile and was sitting on the radiator when O'Hern and Sherman Fleetwood approached in a pick-up. The defendant slid off the radiator with a pistol in his hand, drew the gun on them and ordered them out of the pick-up truck. He fired over their car in order to make them get out. He told Ray O'Hern he wasn't going to harm him, but repeatedly said to his father Sherman Fleetwood, "Get out, old man, I am going to kill you, you old son of a bitch", "you shot at me and I am going to kill you", to which the old man replied, "I just shot at you to scare you." He accused the old man, on this occasion, of furnishing evidence that Rollie stole some cattle. He hit the old man in the head with the pistol knocking him down and made him admit that he and not Rollie stole the cattle. The blow defendant struck the old man inflicted a deep gash on his head.

Scott Morgan, formerly city marshal and deputy sheriff of Boynton, testified that before quail season Rollie Fleetwood brought an automatic shotgun and left it with him for sale. No buyers were found and Rollie picked it up in about a week and a half. He further testified that about 7 weeks before the killing Rollie tried to get him to arrest his Dad and Coon Motley for being in unlawful possession of whiskey. He suggested that if he arrested his father he would probably have to kill him or his father would kill him or Coon Motley would kill him. He related that Rollie suggested that he, Morgan, should rob his father of $1,500 or $2,000 which Rollie said Sherman Fleetwood carried in the bib of his overalls.

Sid Jordan testified that on December 24, the day before the killing, he saw the defendant in the road by Jordan's house and Sherman Fleetwood drove by and Rollie Fleetwood said, "There goes that old son of a bitch". It clearly appears that defendant had great animosity towards his father Sherman Fleetwood. He further testified that on Monday following the killing Rollie came to his house with a .22 rifle and wanted to borrow $5 on it. Jordan said he told him he had no money. The defendant said his papa got killed and he hated it, whereupon Jordan said, "You are not going to saddle me with that gun," and the defendant said, "He got shot with a shotgun". Nevertheless, the defendant left the gun with Jordan. The defendant's contention was that he left it Sunday morning for whiskey but Jordan denied this.

On Christmas Eve there were 6 or 8 young people congregated at defendant's home visiting the defendant's son and daughter. The state's evidence as to the killing on Christmas Day revolves around their testimony. In this regard the record shows the decedent, Sherman Fleetwood, left the home of his daughter Mrs. O'Hern about 9:00 or 9:30 in the morning on December 25, 1949, in his 1937 or 1938 Packard auto to go to the old home place and tend his stock. The shortest route to the old farm was past the defendant's home.

From Mrs. O'Hern's testimony her father had $300 to $500 on him, and usually carried a German Luger pistol in the glove compartment of his automobile. Friday before Christmas she said he gave her some money and he had several hundred dollars then. She said she expected her father to return from the mission to the old place about noon. Though she was anxious about his failure to return no one went to see about him. She also testified her father was opposed to hunters and on several occasions he had run them off. On the day in question she heard shooting around and she felt there were hunters in the vicinity.

Bill Kannady and his two sisters passed the decedent as Sherman Fleetwood was going east to his old farm. F. W. Kannady said about 9:45 a.m., he saw

a 1939 or 1940 dull colored Buick auto parked on the east side of the road headed north, about a half mile south from the scene of the killing.

Henry Terry testified that he came to Rollie Fleetwood's house Christmas day about 10:15 a.m., with Cornell (Red) Ulrich. Ulrich's car, he said, was a 1940 light green colored Ford with black rear fender guards with a picture of a woman in a bathing suit on them. Hanging in the front of his automobile on the windshield were highly decorative imitation birds. While they were at Rollie's the defendant asked Ulrich for the use of his car. Ulrich stated his car had a loose rod, whereupon Hardin Lowe offered his car to the defendant, which the defendant, Rollie Fleetwood, declined. He insisted on using Red's car. It thus appears that he had some impelling motive for using Red Ulrich's automobile. Terry further testified that before the defendant left he heard him say he was going to kill his father. He said the defendant put a long barrel gun in Red Ulrich's car before he got in the automobile. The defendant, he said, seemed to be in a rage. He said this statement was made out of the hearing of the other young people, in another room. On cross-examination he stated he left Rollie's place with Bill Bullick and his wife, and Jenks Lowe whom he told about the defendant's threat against Sherman Fleetwood. It is well to point out here that notwithstanding this testimony neither Bullick's wife or Jenks Lowe were called to impeach this testimony given by Terry.

E. W. Forrest, who was also a visitor at Rollie Fleetwood's house the day in question, testified that about 9:00 a.m. he saw Sherman Fleetwood pass the defendant's house going east in his Packard automobile. He further related he heard the defendant say he was going to see the old man or something. He testified he heard the defendant ask Red for his car, and in substance, related the same conversation between Red and Hardin Lowe as is hereinbefore set forth in the testimony of Terry. He said that he saw the defendant with a shotgun in his hand, outside the kitchen door, and saw him carry it around the house but did not see it in Red's car. He testified he saw Rollie Fleetwood leave in Red Ulrich's car. He related that some one said, "Stop him", but that Mrs. Fleetwood said to let him go ahead, he knows what he is doing. He estimated the defendant was gone about 45 minutes and returned with the shotgun in his hand, some papers wadded up in the other hand, and that when he came into the kitchen, he took a pistol in a scabbard from his pocket, handing it to Mrs. Fleetwood, telling her that he had killed the old man, that he begged him not to shoot him but that he had shot him in the breast and in the head. Then Mrs. Fleetwood sat down on the side of the bed and began to cry. He testified the defendant stated he got the pistol out of the front side of Sherman Fleetwood's car. For the second time he tried to borrow Ulrich's automobile to go up the road about 3 miles. At this time Ulrich refused to let him have the automobile. This witness said when he heard the defendant make the statements last referred to he was in the room "where they eat at", with Mary Francis, the defendant's daughter. The record shows the other young people were in the front room. The defendant then got in his own automobile and drove off taking the pistol with him, Forrest related.

Cornell (Red) Ulrich testified that he drove Henry Terry to defendant's house on Christmas morning looking for Hardin Lowe. When he first got to Rollie Fleetwood's house, Lowe and Rollie were gone. He asked where they were and turned around and started away and met them on top of the hill, as they approached in Rollie's car. Ulrich described his car as conspicuous, being a light green in color, with imitation colored birds hanging on the inside of the windshield and bathing beauty girls painted on the rear wheel skirts. About 15 minutes after Ulrich arrived, Lowe and the defendant arrived back at defendant's house. He stated the defendant insisted on using his green

colored Ford even after he was told the rods were loose, and finally he consented to let him have it. The witness stated the defendant did not disclose his purpose in wanting to use his automobile. Hardin Lowe, he testified, offered his car but the defendant declined to use it. He further testified he saw the defendant get into Red's car armed with a long barrel gun. He did not know whether it was a rifle or shotgun. About 10 minutes later Jack Forrest and Bub Fleetwood left in a black Ford car. Before Rollie got back Red Ulrich left with Hardin Lowe to go and find his car and Rollie Fleetwood. In their rounds they saw another green car the same color as his but it was not Ulrich's car. They turned around and went back to the corner, turned north towards the old Fleetwood place. Some distance from the road running east and west and in front of the Sherman Fleetwood place, they saw the defendant backing out. They drove on north and met him as he drove south. The defendant Rollie Fleetwood said, "Come on down and we will have that drink now". When they got back to the house the defendant still had the long barrel gun, which he took with him into the kitchen. He also had a gun in his pocket. Very shortly thereafter he wanted to borrow Red Ulrich's car again, saying he had forgot something. Red declined the use of his car and the defendant left in his automobile. Ulrich said the defendant still had the gun in his pocket. The defendant went back east again in the direction of the old place. Ulrich said he and Henry Terry left shortly thereafter and Hardin Lowe left with Bill Bullick. In the latter statement he is corroborated by Terry. Terry said he left with the Bullicks and Jenks Lowe and told them of the threat made against Sherman Fleetwood's life. The Bullicks and Jenks Lowe were not called to deny he told them of the threat.

Hardin Lowe testified that he was at Rollie's house on Christmas morning and that Red Ulrich and Henry Terry were there. He stated he heard the conversation between Red Ulrich and Rollie about Rollie borrowing Red's car. Lowe said he offered the defendant his automobile but Rollie insisted on Red Ulrich's. He saw the defendant leave in Red's automobile with a long barrel gun, whether a shotgun he did not know. Later he and Red Ulrich left in Lowe's car to find the defendant. He stated they went to Champ Clark's. Not finding him they came back. On the way back they saw a green car that looked like Red's but it was not. They then went north towards Sherman Fleetwood's old place and met the defendant driving south in Red's car, they turned around and came back to Rollie Fleetwood's. He testified the defendant had been gone about 20 minutes. When they returned the defendant wanted to borrow Red Ulrich's automobile again but Red refused and the defendant left in his own car and was gone about 10 minutes. He testified he did not hear the defendant or anyone else say, at any time, he was going to, or had gone to kill his Dad. He heard no shotgun reports. Moreover he said he heard nothing of the killing until 8:00 o'clock the next day.

Marvin Lee Payne's testimony was to the effect that together with his family he was coming from Muskogee to his uncle's home about a mile and a half from the defendant Fleetwood's place. He stated he passed a green car just like his about 10:30 a.m. parked at the curve just east of the Sherman Fleetwood place. He said the car was headed southwest. This automobile had imitation birds hanging in the front of the windshield. He did not notice any skirts on the back end of it with bathing beauty girls on them. He testified a little man was in the car, a light haired fellow. He said it was not the defendant. The fellow in the automobile that he saw was not black headed. He could not identify the person he saw in the green automobile. He stated, however, he seemed to be stooped over like he was hiding something. He also saw a blue or black Ford about a hundred yards off the road in the field south and east

of the scene of the killing. A little farther he also saw a Buick car about a half mile from the green Ford. Both the black colored Ford and Buick were empty. The Buick was headed south. While in the vicinity of the killing he said he heard shotgun reports on the right and after he saw the man in the green car. He said he heard 2 gun shots just about the time he passed the dark colored Ford. These shots came from the west side of the road which would be on the same side as Sherman Fleetwood's old place. The record shows Sherman Fleetwood was shot 3 times with a shotgun.

The medical proof in this connection shows the decedent Sherman Fleetwood was shot from behind, at very close range, because the hole in Fleetwood's head was only about an inch in diameter. This wound was behind the left ear.

The testimony of Brick Fowler shows that there was a large tree on the west side of the gate of the lane running north and south leading into the Sherman Fleetwood place from the section line road running east and west. This tree appears from the plat to have been in line with the blast from the shotgun that killed Sherman Fleetwood. The charge struck him behind the left ear leaving a wound about one inch in diameter, as hereinbefore set forth. He further testified that there was a clump of trees and bushes along the fence near the scene of the killing. Other than these there was nothing to obscure the presence of an assailant. He stated no empty shells used in the gun that killed Sherman Fleetwood could be found. The record shows decedent's car was parked outside the gate of the lane about four or five feet from the gate and the body of Sherman Fleetwood was lying west of the car three or four feet from it, facing north. The gate had been closed behind the car and the left hand door of the car was open.

Mr. Bede's testimony was in substance that he lived about a half mile northeast of the Sherman Fleetwood place. He related that about 8:30 Christmas morning he left home to go and cut wood. When he left his home and turned south on the north and south section line east of the Sherman Fleetwood's place **he did not see the automobile** parked in the lane west and south of the east and west highway. The plat in the record shows that the corner where he turned south was about 157 yards east of where Sherman Fleetwood's car and body was found after the killing. When he returned about 11:00 o'clock a.m. with a load of wood he stated he heard three shots from a shotgun but he attached no importance to it, because he thought they were rabbit hunters. A couple of colored hunters from Haskell, Oklahoma, whom he did not know, had been given permission to hunt on his place. He stated they left their car at his house before he left to gather wood. When he returned at 11:00 o'clock with a load of wood, he saw Sherman Fleetwood's car parked like it was coming out of the gate west of the northeast corner of the Sherman Fleetwood place, but he did not see Sherman Fleetwood. Later he again saw the automobile about 3:30 or 4:30 p.m. in the same place. He got suspicious and went to investigate; as he approached from the east he said he saw the hand of Sherman Fleetwood under his car. He did not see Sherman Fleetwood's body because the car was between him and the body. He stated he made no further investigation but returned home and told his "woman" he was going to call the sheriff.

The record shows that Sherman Fleetwood had a large watch on a leather thong which he carried on the bib of his overalls. The leather strap was on his overalls but the watch was gone when the dead body was discovered. His billfold was gone. His pistol and scabbard were gone. He only had a little small change in his pocket.

There were other witnesses for the state who testified to the defendant's ownership of a shotgun and the fact it was in his possession a few days before,

the killing, as well as those who testified it was in his possession on the day of the killing. No fingerprints were taken from Sherman Fleetwood's car and no identifiable tracks found in the vicinity, because it had been drizzling rain the day of the killing. The officers found no guns of any kind at the defendant's premises.

Brick Fowler corroborated Mr. Bede substantially as to the location of the body and the car.

There were other witnesses for the state but the foregoing presents the essential facts offered by the state and as testified to by its principal witnesses.

Among the important witnesses who testified on behalf of the defendant was Charles (Bub) Fleetwood, the defendant's 15-year old son. He testified that on Friday before Christmas he came home and found a shotgun in one of the rooms, sitting between the dresser and the corner and some shells were also there. He said he and Alex Posey took the gun out and shot some blackbirds. He testified further he put it back and never used it again. He said that on Christmas day his mother asked him to get a guinea for her but he could not find any shells for the .22 rifle so he and Jack Forrest caught a hen and killed it. Shortly thereafter he left for Champ Johnson's to see about a muffler. When he came back his father was there. He said he never heard his father say anything about going to or having killed his Dad. On cross-examination he denied ever having any conversation with his father about a shotgun or shells. He said he did not see his father on the trip to Champ Johnson's. He further related that the car driven by Red Ulrich and Terry was a green 1942 Ford. His statement, made in the county attorney's office on December 29 in regard to the gun and what his father said in relation to it, and what he saw while he was at Champ Johnson's was read to him, and he testified he did not remember anything about some of the important features contained in the statement. The nature of this impeaching testimony will appear in the state's rebuttal.

Mary Francis Fleetwood also appeared in behalf of her father. The important part of her evidence was that she heard no conversation about her father going to or having killed his father.

Mrs. Fleetwood's evidence in behalf of her husband was important in the same regard and was the same as Mary Francis Fleetwood's, substantially to the effect that she never heard her husband make any statement about going to or having killed his father. In addition she testified she did not know her husband had left home but said that later he came into the kitchen and handed her some whiskey in a paper sack. She admitted that she saw Sherman Fleetwood pass her house Christmas morning. On cross-examination it developed that this was about 10:00 a.m. She denied any knowledge that there was a 20-gauge shotgun on the place.

Rollie Fleetwood appearing in his own behalf testified he was 37 years of age. He said he was born on the old Fleetwood place where the killing occurred. He had a wife and 2 children, Bub 15, and Mary 18. He admitted he and his father did not always get along, and had arguments. He confessed his father helped him financially and went on his notes at banks in Bixby and Sapulpa. He said his father was pretty overbearing at times. He related that his father was rough with hunters who came on his place. He testified he was a mechanic, and a Chevrolet car belonging to Walter Coleman was brought on his place Friday before the killing. He stated it contained a single barrel shotgun and three or four boxes of shells. He testified he took the gun in the house and put the shells up in the cabinet, but his wife told him she put it back in the Coleman car. He related that he had not seen the shotgun since Coleman took

the automobile. It is well to observe here, that in rebuttal Walter Coleman denied there was a shotgun in the car when he left it at the defendant's place, and stated positively there was none in it when he took it away before the killing occurred on Sunday, Christmas Day. It is well to note that Mose Perkins, who drove the tractor that pulled the car over to the defendant's place, corroborated Coleman in regard to the fact that there was no shotgun in the automobile either at the time it was delivered to the defendant's place or when it was taken away. The defendant admitted that he, Jack Forrest and Hardin Lowe did some heavy drinking all night Saturday night and the next morning. He described his house as having three large rooms and a small room. He testified that there were young people in the southeast room, talking, on Christmas morning. He said he told his son to go and kill a chicken or a guinea. Jack Forrest and Bub Fleetwood left but before they did, they got the .22 rifle to shoot the guinea, (they fly so bad), but they could not find any shells for the gun. In this connection the defendant testified on cross-examination as follows:

"Q. And what was the exact conversation about a guinea hen? A. Well, my wife said, 'What are we going to kill, one of them· guineas, or a fat hen?" I said, 'Kill one of them old guinea roosters.' I said, 'Don't kill the young guinea hens' and I said, 'If we can't kill it', I said, 'well kill one of the fat hens' and they started looking for shells for the shot gun. They said they didn't have any, and I said, 'Look in my old dirty overalls I have been working in, there might be one or two in there'. They looked for shells and couldn't find any for the shot gun and the boys then decided they would run him down and catch him."

The record shows they gave up the guinea idea and got a hen. He said he did not see his father drive by his place that morning. He admitted that he took Red Ulrich's car and left. He gave the reason for taking Red Ulrich's car was that the starter sometimes would not turn over on his car. He testified he took the .22 rifle with him to Sid Jordan's to trade it for a quart of whiskey. He said he left the rifle with Sid Jordan in trade for a quart of whiskey. He said they went up the road north of Jordan's place behind a grove and got the whiskey. The defendant said when he left Jordan's place he backed out of the grove and met Hardin Lowe coming up the road north. In this connection Officers Fowler and Rains testified in the state's case in chief that defendant told them he never got any farther east than Sid Jordan's on the day of the killing. He positively denied that he made the statement that he was going out to kill his dad, or on his return that he killed his dad. He admitted that after he got the whiskey from Sid Jordan and returned he left the gun in his own car, and this was about 20 minutes after he left the first time. He stated he did not go up to the Y at the old Sherman Fleetwood's place at any time that day. On the second trip after he came from Jordan's, as he said with the whiskey, he had no difficulty in starting his own automobile. He said he went back to Sid Jordan's and Sid was not there and he came back. He related his wife told him dinner would be ready in about 30 minutes. He then drove to Bixby. He found Hardin Lowe's car in a ditch and helped him out. He testified all the beer joints were closed and he came home from Bixby. He stated that after dinner he went in the southeast room and slept until 3:30 or 5:00 p.m., then he went to Bud Morgan's place and Jack Forrest accompanied him and his family. He related that they stopped at a beer joint and got a dozen bottles of beer and went to Bud's. He testified it started raining and he came back home and about midnight he was awakened by Jeff Fleetwood and Claude Burkley, who told him about his father's death and he stated that was the first he knew of it. The next morning he was arrested. He testified he was black-headed, 6 feet tall and weighed about 235 pounds. His evidence was that there was a big walnut tree standing west of the gate where his

father was found. He denied hitting Sherman Fleetwood when he had the altercation that O'Hern testified about and stated that defendant blocked the road. He denied that anything occurred on that occasion about cattle stealing. He testified the argument was over a woman his father had been associating with. However he admitted his father appeared against him as a witness in a cattle stealing case but contended he had no bad feeling against him because of it. He denied O'Hern's testimony that he hit his father with a pistol, and said he did not have a pistol. On the occasion when he blocked the road, he said he acted like he was going to hit his father and that Sherman Fleetwood dodged and hit his head on the truck. He also denied the incident O'Hern testified about at Bixby, stating that he and his father had no cross words and that it was Ray and him that had the fuss.

In relation to the incident Scott Morgan testified occurred at Boynton between himself and the defendant, he admitted he left the 12-gauge shotgun with Mr. Morgan to sell. He testified the shotgun belonged to another fellow. He said when it was not sold he gave it back to the other fellow. He did not say who the other fellow was. He said his father shot at him the time the old place burned down. He testified his father had a woman named Florence Martin in the house with him and that he grabbed his father and told his wife to go and fight Florence Martin. He said his dad jerked out a knife and broke loose, that this Martin woman jumped in his dad's car and handed Sherman Fleetwood the German Luger that he carried in his car. Then he said his father took it and fired at him three times. He testified that Walter Coleman brought the single barrel shotgun to his home in Walter Coleman's Chevrolet automobile. He first said there were 16 shells, then 3 or 4 shells. He said he took it in his house into the kitchen. He said on direct examination that Saturday his wife said he had better put it back in Coleman's car, so he put it in the back of the car. On cross-examination he stated he never knew what became of the gun. He stated the boys shot up the shells. He did not know if the gun belonged to Coleman. He admitted he had been drinking practically all day Saturday, Saturday night and Sunday morning until 7:30 a.m. He denied that he had a gun when he returned from Sid Jordan's place the first time in the green Ford, or that he had a pistol or papers in his hand. He contended that he only had a quart of whiskey. He testified he did not know E. W. Forrest was where he could hear the conversation between his wife and himself when he got back from his trip in the green Ford. He admitted he had numerous borrowed shotguns on his place off and on but denied having any of his own.

This in substance constitutes the material evidence offered by the defendant in his own behalf. In many points it is contradictory and filled with inconsistencies.

On rebuttal Walter Coleman testified he had no shotgun and stated there was none in the car when he took it to Rollie Fleetwood's house. Moreover he positively testified there was no gun in the car when he re-possessed it.

On rebuttal Mose Perkins went to Rollie Fleetwood's home with Coleman when the Coleman car was delivered. He stated he drove the tractor and Coleman drove the car. He related there was neither a shotgun nor shells in the car.

Brick Fowler testified on rebuttal that Bub Fleetwood made a statement in the county attorney's office on December 29, in substance to the effect that he had used a shotgun Monday and Friday, that it was a 20-gauge shotgun. He stated the boy stated that it must have belonged to his daddy or he borrowed

it. He told Miss Margie Avers, secretary in the county attorney's office who took down his statement, that his father was bound to have known it was there, that he told him to put it up and quit wasting the shells.

On December 29 Rollie Fleetwood was questioned by Roy Rains, and he told him that he had not had a shotgun of any kind around the house in two or three years. He further stated that Rollie Fleetwood told him he soaked his .22 rifle on Sunday December 25 to Sid Jordan for $5 cash.

Miss Margie Avers, secretary in the county attorney's office, testified on rebuttal for the state to taking the statement of Bub Fleetwood containing the foregoing remarks relative to the 20-gauge shotgun. Among other things she related he said he put it back in the corner under some clothes, and that he stated he knew his daddy was gone from home on Christmas for about 20 minutes, returning in Red Ulrich's car ahead of Hardin Lowe's car. Further, that he left home shortly thereafter in Jack Forrest's car to go to Champ Johnson's and that while he was at Champ Johnson's he saw the green Ford come back by, followed by Hardin Lowe and Red Ulrich in the Chevrolet. He stated that when he returned home from Champ Johnson's, Hardin Lowe, Red Ulrich, his mother, his sister and Everett Forrest were there but their car was gone. The foregoing contains a substantial condensed statement of the evidence herein involved.

Roy Rains' testimony on rebuttal revealed that his investigation of the case disclosed that Sherman Fleetwood had some bitter enemies in the vicinity.

The defendant urges the insufficiency of the evidence upon which to find the defendant guilty and impose the death penalty. His contention is that the evidence was entirely circumstantial. While this statement is substantially true, it is not entirely correct. The circumstances strongly point to the defendant's guilt. Henry Terry's testimony that he heard the defendant say he was going to kill his dad, and the defendant seemed to be in a rage, presents a circumstance which the jury could not overlook. E. W. Forrest's testimony to the effect that he heard him say that he had killed the old man and that he begged him not to kill him but he shot him in the head and in the chest is direct evidence and not circumstantial. Story v. State, 88 Okla. Cr. 141, 200 P. 2d 774; Cordonnier v. State, 86 Okla. Cr. 291, 192 P. 2d 298; Flanagan v. State, 74 Okla. Cr. 127, 124 P. 2d 270; Lincoln v. State, 86 Okla. Cr. 415, 193 P. 2d 618; Overton v. State, 95 Okla. Cr. 127, 243 P. 2d 363. This was a confession of guilt, which undoubtedly was most persuasive upon the jury.

The state established other circumstances pointing to the defendant's guilt in proof that there was bad blood between the defendant and his father. The establishment of the fact that he had twice threatened to kill his father, and on one occasion had knocked him down with a pistol and inflicted a severe head wound indicates a strong feeling against the old man. The further circumstance that he had referred to his father on Friday before the killing on Sunday as an "old son of a bitch" imports bad feeling. The fact that he had insisted on using the conspicuously green and decorative Ford of Red Ulrich on the occasion in question is a circumstance that points to the defendant's attempt to place suspicion of guilt upon the owner of said automobile. His explanation that he did not use his car because the starter did not always work, falls flat in light of the fact that when he made his second trip away from home that morning, he did not have any difficulty in starting his own automobile and using it. The fact that his father was seen passing the house by his wife about 10:00 o'clock is a circumstance indicating that he might have known of the old man's whereabouts. The fact that there was a shotgun and shells on

the place as late as Friday, and the fact that on the day of the killing the defendant himself admitted that they started looking for shells for the shotgun, and the fact that he told them where they might find some, points strongly to the fact that there was a shotgun and shells on the premises. The defendant admits that he drank to excess before the killing. Th fact that the defendant was seen with a shotgun on Christmas morning clearly establishes the fact that there was a gun on the premises that day, and when considered in connection with the fact that the defendant was seen putting a gun in the green colored Ford, before he left the first time is a circumstance which points strongly to the defendant's guilt. The fact that the defendant admits that he procured the use of Red Ulrich's conspicuous car also strongly points to his guilt. Moreover the established fact that the car was seen in the vicinity of the killing is a strong circumstance indicating that the killer occupied this automobile.

The fact that the defendant knew of the surroundings and the location of big walnut tree west of the gate, when considered in light of the other facts, is a circumstance that indicates that the killer may have hidden behind the tree, and that the killer was the defendant. Evidence to the effect that the defendant returned in possession of a pistol and the holster, and a shotgun and some papers, is a strong circumstance pointing to the guilt of the defendant. Especially is this true when considered in light of the fact that he was overheard to say that he had just killed the old man, that he begged him not to shoot him but he shot him in the head and the chest. Furthermore, shortly after these things occurred, the fact that for the second time he again asked Red Ulrich for his car, stating that he had forgotten something and the use of Ulrich's car, being denied he left in his own car, again points to the fact that he was trying to place suspicion on the owner of the green automobile. If this was not true it was certainly to dispose of the shotgun, the papers, the pistol and holster. Even though the defendant was heavily loaded with whiskey and beer, in our opinion, he almost planned a perfect crime designed to place suspicion on Red Ulrich.

There are many other circumstances that indciate the defendant's guilt, which we will not burden the opinion by enumerating. Nevertheless, in face of all these facts the evidence is largely circumstantial. We might make further observations but this suffices to demonstrate the jury had ample evidence upon which to predicate their verdict of guilty. The most that can be said of the evidence is that it was conflicting. Such evidence presents a question of fact for the jury. Doty v. State, 88 Okla. Cr. 381, 203 P. 2d 444, where in the first, second and third syllabi we stated the law applicable to such cases as follows, towit:

"One charged with crime may be convicted upon circumstantial evidence as well as direct and positive testimony.

"Where circumstantial evidence alone is relied upon for a conviction, the facts and circumstances proved must not only be consistent and point to the guilt of the defendant but they must be inconsistent with his innocence.

"When, in the trial of a criminal case, the evidence relied on to connect the accused with the crime charged is entirely circumstantial, it must do more than raise a suspicion or inference of guilt, but must point clearly and conclusively to guilt and exclude every reasonable hypothesis of innocence."

The defendant contends that it is most improbable that the defendant would come in and admit killing his father and tell how he did it, or even that he would state his intentions so to do. With this contention we cannot agree, for a man who had consumed as much liquor as had the defendant,

more often than not becomes loquacious, and is not given to breathe their intentions, or relating their accomplishments in whispered or subdued tones.

But notwithstanding the strong evidence of the defendant's guilt, no one saw the defendant actually do the killing, and the record presents an outside suspicion, but not a reasonable hypothesis of innocence, that the killing may have been committed by hunters whom Sherman Fleetwood disliked with a vengeance, and whom he may have insulted, or that his life may have been taken by some of his numerous "sharecropper" enemies in the community, or that he may have been the victim of a well designed and concealed robbery. Faced with these outside suspicions we are of the opinion that the evidence while sufficient to support the conviction, does not measure up to that high degree of certainty as to the identity of the killer of Sherman Fleetwood to warrant the imposition of the death penalty. No doubt this is the situation that prompted trial Judge Ladner to remark, on hearing the motion for new trial, as follows, to wit:

"The jury found beyond a reasonable doubt that this defendant committed this murder. The principal question in this case was as to who committed it, a question of identity. The case was, to a large extent, based upon circumstantial evidence, except some of those statements he is supposed to have made before and after the killing, that he was going to kill him and when he came back, that he had killed him. The jury was convinced beyond a reasonable doubt that this defendant did it, and this Court is convinced beyond a reasonable doubt that this defendant did it, but I can't say that there is absolutely no doubt in this Court's mind. I can't say that there is not some shadow of a doubt as to whether this defendant did it, or whether somebody else might have done it. There is some peculiar testimony in this case, with respect to other matters and other possibilities. For that reason, I feel that it would be much easier for me to just overrule this motion, without making these comments in the record; but if I did so, I would in my humble judgment, be derelict of my solemn duty and obligation. I might say this too, that in cases of this kind, it is absolutely more possible for a jury and for courts to make a mistake, than in the usual case for this reason. This man undoubtedly is a bad character from the evidence of his previous conduct and so forth. It is much easier for a jury and this court to commit error against a bad character than it is against a good character. For all of these reasons, and because time may actually prove that somebody else may have done it, I want to state into the record that I believe the Criminal Court of Appeals should very carefully consider it, and I am sure they will. As far as this Court is concerned, this court, if it was within the power of this Court, would be inclined to reduce the sentence from death to life imprisonment. * * *"

The defendant finally urges that it was error for the trial court to permit the impeachment by the state of its witness E. W. Forrest. It appears from the record, that Charles (Bub) Fleetwood and Jack Forrest testified for the defendant and were each asked on cross-examination about an alleged conversation they had with E. W. Forrest, in which E. W. Forrest told them in substance, that the defendant had "shot his dad and that he got his pistol, too", to which Bub Fleetwood replied in substance that "if he got his pistol he killed him because that was the only way he could ever get his pistol". This conversation they denied, then the state recalled E. W. Forrest for rebuttal to impeach these two witnesses. This the witness, E. W. Forrest, failed to do. The state expressed no surprise, but then in order to get this evidence in the record proceeded to use the statement made by E. W. Forrest to the county attorney on December 31, 1949, relative to the conversation, a collateral matter, all of which was not given under oath, and all of which E. W. Forrest denied took place. In this way the county attorney supplied what the witnesses refused to testify to under oath, concerning the conversation collateral to the alleged

murder. All of this was sanctioned under the purported authority of Akin v. State, 91 Okla. Cr. 47, 215 P. 2d 569, wherein the witness had testified under oath as a witness at the hearing for bail. This evidence in the Akin case given at the preliminary, was available for impeachment of contradictory evidence given at the time of trial, because it related to a material matter, to wit, the hammer allegedly used by the decedent in precipitating the difficulty. Such is not the situation herein. The impeachment sought to be established herein was upon a bare statement as to a conversation, a collateral matter, not directly connected with the killing, which was not made under oath, thus subjecting the defendant to a possible conviction on unsworn collateral evidence, denied by the witnesses sworn to tell the truth. The rule announced in the Akin case cannot be extended to cover a situation where a witness called for impeachment purposes, who fails so to do, can then be impeached on a collateral matter by means of an unsworn statement, previously given to third persons at another time. Moreover, to do so would violate the sound rules of evidence, and be in absolute disregard of the sacred requirement of permitting convictions only on evidence given under oath. This evidence was improperly admitted. The statement of E. W. Forrest made to Bub Fleetwood and Jack Forrest, not having been made in the defendant's presence, was not binding on him for the reason it was collateral and immaterial. We are of the opinion that this evidence, by way of impeachment, should not have been admitted. There is no end to the evil that might be wrought if such a procedure were approved. The law will not sanction such a contrivance. See 70 C. J. 1046, § 1238:

"A witness may not be impeached by showing contradictory or inconsistent statements by him in respect of collateral, irrelevant, or immaterial matters, as where on cross-examination the witness has denied making a statement as to collateral, irrelevant, or immaterial matter, the cross-examiner is bound or concluded by the answer, and may not introduce evidence to prove that the witness did make the statement which he denied making, * * *."

Citing a multitudinous number of cases including Willis v. State, 13 Okla. Cr. 700, 167 P. 333:

"When a witness is cross-examined on a matter collateral to the issue, his answer is conclusive and cannot be subsequently contradicted by way of impeachment by the party putting the question. The test of whether a fact inquired of in cross-examination in collateral is this: would the cross-examining party be entitled to prove it as a part of his case tending to establish his plea?"

See, also, Freels v. State, 18 Okla. Cr. 456, 195 P. 1094; Phillips v. State, 20 Okla. Cr. 415, 203 P. 902; Scott v. State, 50 Okla. Cr. 396, 298 P. 626; Hall v. State, 51 Okla. Cr. 50, 299 P. 508; Clark v. State, 95 Okla. Cr. 119; 239 P. 2d 797.

Much of this evidence was elicited without any showing of surprise before impeachment was resorted to. The court apparently tried to cure this error in a later statement, as to its admissibility and its limitations, in keeping with the foregoing rule. But on the element of surprise this announcement did not supply what the county attorney failed to register. Moreover, only on the basis of mere surmise can it be said what the witnesses testified to was injurious to the state. They testified no such a conversation occurred. So did E. W. Forrest, the state's impeaching witness. The testimony of each of them should have ended the inquiry. Under some conditions we would be compelled to hold such procedure would constitute reversible error. However, we are of the opinion that this matter is but another situation, which added to what has already been said, constitutes grounds for modification. It does not create a situation warranting a reversal of the case for a new trial. Only because of the lack of positive identity and the error of law last hereinbefore referred to, are we constrained to resort to modification in this case, for if the defendant

did kill his father under the conditions indicated by this strong chain of circumstances, he is devoid of all the filial instinct, love and affection a child should manifest towards his father, and is unworthy of having the mantle of mercy thrown about him. Only because of the foregoing reasons are we constrained to modify the judgment and sentence herein imposed, from the death penalty to life imprisonment in the penitentiary. For all the above and foregoing reasons the judgment and sentence herein imposed, is modified, from the death penalty to life imprisonment, and as so modified is affirmed.

JONES and POWELL, JJ., concur.